589 F.2d 603
 191 U.S.App.D.C. 80
 MIDWESTERN GAS TRANSMISSION COMPANY, Complainant,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Michigan Wisconsin Pipe Line Co., Foothills Pipe Lines and
Pan-Alberta Gas Ltd., United Municipal Distributors Group,
Northwest Alaskan Pipeline Company, State of Louisiana,
Entex, Inc., Louisiana Gas Service, Southwest Gas
Corporation, Mississippi River Transmission Corp., United
Gas Pipe Line Co., Pacific Interstate Transmission Co.,
Northern Natural Gas Co., Southern Cal Gas Co., The People
of the State of Cal and the Public Utilities Commission of
the State of Cal, Panhandle Eastern Pipe Line Co., Pacific
Refining Co., State of Mississippi, San Diego Gas & Electric
Co., Pacific Gas Transmission Co., Pacific Gas & Electric
Co., Wisconsin Gas Co. et al., Michigan Consolidated Gas
Company, Vermont Gas Systems, Inc., State of Alaska, Intervenors.
MIDWESTERN GAS TRANSMISSION COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent, Michigan
Wisconsin Pipe Line Co. et al., Intervenors.
MICHIGAN WISCONSIN PIPE LINE COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent, Midwestern
Gas Transmission Co. et al., Intervenors.
 Nos. 78-1753, 78-1775 and 78-1789.
 United States Court of Appeals,
District of Columbia Circuit.
 
 Argued 4 Oct. 1978.
Decided 2 Nov. 1978.
 SYLLABUS BY THE COURT
 Northwest Alaskan Pipeline Company (Northwest) entered into two contracts with Pan-Alberta Gas Ltd. (Pan-Alberta) to import quantities of Alberta natural gas into the United States. The following month Northwest sought conditional authorization from the Federal Energy Regulatory Commission (FERC) for the contracts. On June 7, 1978, the FERC conditionally authorized Northwest's import applications, after which Midwestern Gas Transmission Company (Midwestern), Michigan Wisconsin Pipe Line Company (Michigan Wisconsin) and numerous other parties petitioned for clarification and/or rehearing of the June 7 order. On July 24, the FERC denied one such petition, and on August 4, it denied the other petitions, finding that Northwest's proposed import contracts and existing import contracts are not competitive and refusing to declare that existing import licenses be given priority over the conditional import authorization.
 From these orders, Midwestern and Michigan Wisconsin timely filed petitions for review under section 19 of the Natural Gas Act, and Midwestern timely filed a complaint under section 10 of the Alaska Natural Gas Transportation Act (ANGTA). Held:
 (1) The Commission acted in this case pursuant to the procedural requirements of the ANGTA, and the substantive requirements of the Natural Gas Act. We affirm the Commission's assumption of jurisdiction under both of these Acts.
 (2) Because the Commission's actions fall under the ANGTA, this Court's jurisdiction to review the FERC's actions is solely under the limited judicial review provisions of the ANGTA, and we therefore dismiss the petition for review filed under the Natural Gas Act.
 (3) We dismiss as not ripe the challenges to the Commission's decisions on the validity of the resale restriction in Northwest's contracts, the public interest, competition and priorities, and competitive hearings.
 (4) The only issue ripe for review is whether the Commission unlawfully refused to hold a hearing prior to issuing a conditional authorization. We affirm the Commission's refusal to hold a hearing, finding it within the bounds of the Constitution and section 3 of the Natural Gas Act.
 Petitions for Review of Orders of the Federal Energy Regulatory commission.
 Melvin Richter, Washington, D. C., with whom Harold L. Talisman and Terence J. Collins, Washington, D. C., were on the brief for petitioner, Midwestern Gas Transmission Co., in Nos. 78-1753 and 78-1775 and intervenor in No. 78-1789.
 William W. Brackett, Washington, D. C., with whom Daniel F. Collins and Charles V. Shannon, Washington, D. C., were on the brief for appellant Michigan Wisconsin Pipe Line Co. in No. 78-1789 and intervenor in Nos. 78-1753 and 78-1775.
 Howard E. Shapiro, Sol., Washington, D. C., with whom Edward W. Hengerer, Atty., Washington, D. C., was on the brief for respondent.
 
 
 1
 Rush Moody, Jr., Washington, D. C., a member of the bar of Supreme Court of Texas, pro hac vice, by special leave of court, with whom Platt W. Davis, III, David B. Ward, Washington, D. C., F. Vinson Roach, Patrick J. McCarthy, Omaha, Neb., Malcolm H. Furbush, Howard V. Golub, Daniel E. Gibson, San Francisco, Cal., Leslie E. LoBaugh, Jr., Los Angeles, Cal., Raymond N. Shibley, Washington, D. C., Brian O'Neill, Stephen A. Wakefield, Houston, Tex., W. DeVier Pierson, and James M. Costan, Washington, D. C., were on the brief for Northwest Alaskan Pipeline Co., et al., intervenors in Nos. 78-1753, 78-1775 and 78-1789.
 
 
 2
 George W. McHenry, Jr., Washington, D. C., for Foothills Pipe Lines (Yukon) Ltd., and Pan-Alberta Gas Ltd., intervenors in Nos. 78-1753, 78-1775 and 78-1789.
 
 
 3
 William J. Grove and William J. Grove, Jr., Washington, D. C., were on the brief for the Pacific Refining Co., intervenor in No. 78-1753.
 
 
 4
 Barry Grossman, Washington, D. C., was on the brief for the U. S. as amicus curiae urging affirmance.
 
 
 5
 C. Hayden Ames, Edward P. Nelsen and Shand L. Green, San Francisco, Cal., entered appearances for San Diego Gas and Electric Co., intervenor, in Nos. 78-1753, 78-1775, and 78-1789.
 
 
 6
 J. Calvin Simpson and Randolph W. Deutsch, San Francisco, Cal., entered appearances for People of the State of Cal. et al., in Nos. 78-1775 and 78-1789.
 
 
 7
 Robert A. Nuernberg, Appleton, Wis., and Robert H. Gorske, Milwaukee, Wis., entered appearances for Wisconsin Gas Co. et al., in Nos. 78-1753, 78-1775 and 78-1789.
 
 
 8
 John E. Haley, Washington, D. C., and Gary L. Cowan, Detroit, Mich., entered appearances for Michigan Consolidated Gas Co., intervenor in Nos. 78-1753, 78-1775 and 78-1789.
 
 
 9
 Charles V. Shannon, Washington, D. C., entered an appearance for Michigan Wisconsin Pipe Line Co., petitioner in No. 78-1789 and intervenor in Nos. 78-1753 and 78-1775.
 
 
 10
 Thomas D. Clarke, Los Angeles, Cal., entered an appearance for Southern California Gas Co., intervenor in No. 78-1753.
 
 
 11
 William W. Bedwell, Washington, D. C., entered an appearance for Mississippi River Transmission Corp., et al., intervenor in No. 78-1753.
 
 
 12
 Michael J. Manning, Washington, D. C., entered an appearance for Entex, Inc., et al., intervenor in No. 78-1753.
 
 
 13
 James R. Patton, Jr., David B. Robinson, Washington, D. C., and Harry E. Barsh, Jr., Lake Charles, La., entered appearances for State of Louisiana, intervenor in No. 78-1753.
 
 
 14
 William T. Miller, Houston, Tex., entered an appearance for Municipal Distributors Group, intervenor in No. 78-1753.
 
 
 15
 Robert H. Loeffler, Washington, D. C., entered an appearance for State of Alaska, intervenor in No. 78-1753.
 
 
 16
 Paul W. Mallory, Chicago Ill., entered an appearance for Northwest Pipeline Corp., intervenor in No. 78-1753.
 
 
 17
 A. F. Summer, Jackson, Miss., entered an appearance for State of Mississippi, intervenor in No. 78-1753.
 
 
 18
 John D. Paterson, Montpelier, Vt., entered an appearance for Vermont Gas Systems, Inc., intervenor in No. 78-1753.
 
 
 19
 W. S. Stafford, Madison, Wis., entered an appearance for Madison Gas and Electric Co., intervenor in No. 78-1753.
 
 
 20
 Before BAZELON, LEVENTHAL and WILKEY, Circuit Judges.
 
 
 21
 Opinion PER CURIAM.
 
 PER CURIAM:
 
 22
 This case presents both a complaint and petitions for review of three orders of the Federal Energy Regulatory Commission (FERC or Commission). Acting under provisions of the judicially untested Alaska Natural Gas Transportation Act (ANGTA),[1] and the Natural Gas Act,[2] the Commission conditionally authorized two contracts for the importation of Canadian gas into the United States, and denied petitions for reconsideration and clarification of the conditional authorization order.
 
 
 23
 Petitioner/complainant Midwestern Gas Transmission Company (Midwestern) and petitioner Michigan Wisconsin Pipe Line Company (Michigan Wisconsin) challenge the FERC's orders by arguing that: 1) the Commission had no authority to issue the conditional authorization under the ANGTA or the Natural Gas Act; 2) the Commission's record does not support its decisions; 3) the contracts in question violate the United States antitrust laws and the ANGTA; and 4) the FERC violated constitutional and statutory rights by refusing to hold a hearing on these matters. We affirm the Commission's assumption of authority under the ANGTA and the Natural Gas Act, and dismiss several challenges to the merits of the Commission's decision as not ripe. Our jurisdiction is solely under the limited judicial review section of the ANGTA, and we thus dismiss the petitions filed under the Natural Gas Act.
 
 
 24
 We do review the Commission's failure to hold hearings under the Natural Gas Act, finding the action within statutory and constitutional bounds.
 
 
 25
 At this point, for the convenience of the reader, we provide an outline of the opinion following:
 
 
 26
 I. BACKGROUND . . . . . . . 609
 II. THE COMMISSION'S ORDERS UNDER REVIEW . . . . . . . 612
 III. FERC AUTHORITY UNDER THE ANGTA AND THE NATURAL GAS ACT . . . . . . . . 614
 A. Authority Under the ANGTA . 614
 B. Authority Under the Natural Gas Act . . . . . . . . 616
 IV. RIPENESS . . . . . 617
 A. Fitness for Judicial Decision . 618
 1. Decision on Contract's Resale Restriction . . . . . 618
 2. Public Interest Determination 619
 3. Priorities and Lack of Competition . . . . . . 620
 4. Denial of Hearing . . 621
 5. Conclusion on Fitness for Judicial Decision . . . . . 621
 B. Hardship to the Parties . 622
 1. Substantive Determinations 622
 2. Decision Not to Hold Hearings 624
 C. Conclusions on Ripeness . . 625
 V. REVIEW OF THE DENIAL OF A HEARING PRIOR TO CONDITIONAL AUTHORIZATION . . . 625
 A. Standard of Review . . . 625
 B. Right to Hearing . . . . . 626
 VI. CONCLUSION . . . 627
 
 
 27
 The ANGTA provides that this Court "render its decision relative to any claim within 90 days from the date such claim is brought unless such court determines that a longer period of time is required to satisfy requirements of the United States Constitution."[3] Midwestern brought the present claim on August 4, 1978, and in attempting to render a decision by November 2, this case was placed on an expedited briefing and argument schedule.
 
 I. BACKGROUND
 
 28
 In 1968 the largest single discovery of oil and gas ever made on the continent of North America was made at Prudhoe Bay on the North Slope of Alaska.[4] In view of the severe shortage of natural gas in this nation, it became critically important to develop an economical transportation system for bringing Alaska natural gas to the lower 48 states.[5] Several companies therefore applied to the Federal Power Commission (FPC)[6] for authority to build a pipeline to transport the gas. In March 1974 a consortium of gas companies, the Arctic gas pipeline consortium, applied to the FPC for authorization to build a pipeline through Canada's MacKenzie Delta area, across Alberta, and by two branches into the United States. In September 1974 El Paso Alaska Company proposed to transport Alaska gas overland to the south of Alaska, and then by tanker to the West Coast. Finally, in July 1976, Alcan Pipeline Company[7] proposed a pipeline largely paralleling existing pipeline and highway corridors through Alaska and Canada, and by two branches into the United States.[8]
 
 
 29
 While the FPC was holding hearings on these three proposals, Congress enacted the ANGTA.[9] Section 3 of the ANGTA declares the Act's purpose as follows:
 
 
 30
 to provide the means for making a sound decision as to the selection of a transportation system for delivery of Alaska natural gas to the contiguous States for construction and initial operation by providing for the participation of the President and the Congress in the selection process, and, if such a system is approved under this chapter, to expedite its construction and initial operation by (1) limiting the jurisdiction of the courts to review the actions of Federal officers or agencies taken pursuant to the direction and authority of this chapter, and (2) permitting the limitation of administrative procedures and effecting the limitation of judicial procedures related to such actions. To accomplish this purpose it is the intent of the Congress to exercise its constitutional powers to the fullest extent in the authorizations and directions herein made, and particularly with respect to the limitation of judicial review of actions of Federal officers or agencies taken pursuant thereto.[10]
 
 
 31
 Congress established in this Act a five-part procedural framework to expedite a final decision on an Alaska natural gas transportation system (ANGTS): 1) an FPC recommendation to the President of a specific transportation system by May 1, 1977,[11] and comments by federal agencies and others;[12] 2) a presidential decision on the best possible ANGTS;[13] 3) expedited congressional consideration of the President's selection;[14] 4) prompt handling of all federal authorizations "necessary or related to the construction and initial operation of" the ANGTS;[15] and 5) limited judicial review of any agency action to questions of agency violation of constitutional rights or statutory authority.[16]
 
 
 32
 Following passage of the ANGTA, the FPC completed its proceedings on the three Alaska natural gas transportation proposals but was unable to agree on one proposal. At that time there were only four Commissioners at the agency, and they split their votes evenly between the two overland proposals. They thus recommended both of those transportation systems to the President on May 1, 1977, completing the first step in choosing an ANGTS.[17] The Commissioners rejected shipment of the gas by tanker, in part because
 
 
 33
 (t)he Alaska Natural Gas Transportation Act requires the Commission to assess the potential of proposed systems to transport natural gas from other areas in addition to the Prudhoe Bay Field and to determine other uses for the system. . . . The southern portions of both Alcan and Arctic (the two overland proposals) could transport natural gas from fields in Alberta and elsewhere along their route.[18]
 
 
 34
 The Commissioners ultimately were persuaded to select the Alcan Project after the Canadian National Energy Board (NEB) on July 4, 1977, unanimously endorsed the Canadian portion of the Alcan Project over the Arctic Gas Proposal.[19] Like the FERC, the NEB noted the possibility of importation of Alberta gas into the United States through southern portions of the ANGTS built prior to the Alaskan segments.[20]
 
 
 35
 Following the FERC and NEB recommendations, the United States and Canada signed an agreement on "Principes Applicable to a Northern Natural Gas Pipeline."[21] Two days later, on September 22, 1977, the President issued his Decision and Report to Congress on the Alaska Natural Gas Transportation System (President's Decision ),[22] again selecting the Alcan project over the other proposals. In discussing the advantages of Alcan over the other proposals, the Report accompanying the President's Decision[23] stated:
 
 
 36
 A possibility offered by the Alcan project is the effective availability of Alaska gas to the U.S. before completion of the project through pre-delivery[24] of Canadian gas. . . . The joint project (Alcan) will thus ensure maximum availability of Canadian gas in the near term, through continued exports under existing contracts and possible pre-deliveries.[25]
 
 
 37
 The Commission commented on the President's Decision on October 12, 1977,[26] agreeing that the " 'predelivery' plan has the benefit of expediting the time at which northern gas could be made available to the markets in the lower 48 states."[27] The plan also has the benefit, noted the Commission, of encouraging exploration activity in Canada, resulting in early and long-term increased gas exports.[28] Congress approved the President's Decision by Joint Resolution[29] which became law on November 8, 1977, and the Commission subsequently issued a conditional certificate of public convenience and necessity for construction of various segments of the approved ANGTS.[30]II. THE COMMISSION'S ORDERS UNDER REVIEW
 
 
 38
 In March 1978 Alcan's successor, Northwest Alaskan Pipeline Company (Northwest), entered into two essentially identical contracts with Pan-Alberta Gas Ltd. (Pan-Alberta) to import different quantities of Alberta natural gas into the United States. The following month Northwest sought conditional authorization from the FERC for the two contracts. In support of its application Northwest pointed out first that transportation of the proposed Canadian imports would be through the southern or prebuilt portion of the ANGTS from Canada into the United States. Second, Northwest represented that authorization of the proposed imports would significantly benefit construction of the entire transportation system, particularly the prebuilt portion, by providing early financing and thus lowering the cost of construction. Therefore, the imports were claimed to be necessary to permit prebuilding of portions of the ANGTS.[31]
 
 
 39
 Notice of Northwest's applications was published in the Federal Register,[32] and numerous parties, including Midwestern and Michigan Wisconsin, filed petitions to intervene. Only one intervenor requested a hearing; the motion was denied.[33]
 
 
 40
 By order of June 7, 1978, the Commission conditionally authorized Northwest's import applications, concluding that the proposed imports are a material element in the overall desirability of the ANGTS. The Commission noted that although future certification is necessary before final approval of the proposed imports,[34]
 
 
 41
 compliance with the mandate to expedite under Sections 9(a) and (b) of the Alaska Natural Gas Transportation Act (ANGTA) 15 U.S.C. §§ 719g(a) and (b), requires the present consideration of and conditional ruling upon these import applications which are tied to the overall Alaska gas project.[35]
 
 
 42
 The FERC emphasized the preliminary nature of its ruling by noting that the conditional authorization does not constitute any decision on the following matters: "any matters related to the import authorization applications other than the basic question of whether in general such imports are in the public interest."[36] Furthermore, the FERC observed that although proposed imports and related construction of prebuilt pipeline facilities should aid in completing the ANGTS, "before a final decision can be made, many questions related to the specific relationship between the pre-built facili ties and the overall project must be answered by the Commission both independently and in consultation with the Natural Energy Board of Canada. . . ."[37]
 
 
 43
 The June 7 order also preliminarily addressed certain questions on the legality of section 2.8 of the Northwest-Pan-Alberta contracts. This section provides that Pan-Alberta may terminate the contracts if, prior to the commencement of construction of the pipeline facilities, Northwest resells any of the gas to a buyer that is not a member, or an affiliate of a member, in the partnership created to construct the Alaskan segment of the ANGTS.[38] The agreement thus contemplates, at least for a short time, that Northwest resell the gas it buys from Pan-Alberta solely to purchasers who, directly or through an affiliate, have agreed to help construct the northern segment of the transportation system.
 
 
 44
 The FERC found that this resale restriction does not violate section 13(a) of the ANGTA by denying equal access to the Alaska natural gas transportation system on the basis of ownership.[39] The Commission also found that the resale restriction is not an impermissible restraint of trade under the Sherman Act.[40] The analysis was based in large part on the assumption that the resale restriction was required by a Canadian federal or provincial policy, and was therefore not a violation of the antitrust laws.[41]
 
 
 45
 Midwestern and Michigan Wisconsin, among others, petitioned for clarification and/or rehearing of the June 7 order. On July 24 the Commission denied the California Gas Producer's Association's petition, emphasizing that its conditional authorization was based on the President's and its own perception of the national need for increased amounts of natural gas, and repeating that it had reserved "for subsequent adjudication and deliberation . . . any matters related to the import authorization applications other than the basic question of whether in general such imports are in the public interest."[42]
 
 
 46
 Finally, on August 4, 1978, the Commission denied the requests of Midwestern, Michigan Wisconsin and others that the June 7 order be clarified. Petitioners wanted the FERC to declare that extension and renewal of existing import licenses be given priority over the conditional import authorization and any future action connected with the ANGTS. Instead, the FERC concluded that Northwest's proposed imports and the existing import extensions and renewals are not competitive,[43] and refused to make any such declaration of priorities.
 
 
 47
 From these orders, Midwestern and Michigan Wisconsin timely filed petitions for review under section 19 of the Natural Gas Act,[44] and Midwestern timely filed a complaint under section 10 of the ANGTA.[45]
 
 
 48
 We must determine, first, whether the FERC had authority to act under the ANGTA and under the Natural Gas Act, for the Commission's actions cannot be sustained unless its actions properly come within the bounds of these Acts. Next, we must determine whether any of the challenges raised by Midwestern and Michigan Wisconsin are ripe for review, and if so, under what standard we must review them. Finally, we must examine the substance of the FERC's actions.
 
 
 49
 III. FERC AUTHORITY UNDER THE ANGTA AND THE NATURAL GAS ACT
 
 
 50
 Northwest submitted its import applications to the FERC pursuant to the provisions of the ANGTA,[46] and none of the intervenors in the proceedings contested the propriety of Northwest's filing. Subsequently, in granting the conditional authorization, the Commission found that those applications "are tied to the overall Alaska gas project."[47] Again, not one of the numerous parties who requested a rehearing or clarification of the Commission's order challenged this finding. Thus, Midwestern and Michigan Wisconsin raise the issue of the Commission's authority under the ANGTA for the first time in this Court.
 
 A. Authority Under the ANGTA
 
 51
 The FERC bases its authority to grant the conditional authorization on section 9 of the ANGTA,[48] and on section 3 of the Natural Gas Act.[49] Analysis must begin with the ANGTA, which reads in pertinent part:
 
 
 52
 To the extent that the taking of any action which is Necessary or related to the construction and initial operation of the approved transportation system requires a certificate, . . . or other authorization to be issued or granted by a Federal officer or agency, such Federal officer or agency shall (1) to the fullest extent permitted by the provisions of law administrated by such officer or agency, . . . issue or grant such certificates . . . and other authorizations at the earliest practicable date.[50]
 
 
 53
 The critical statutory language is "necessary or related to." To come within the statutory bounds, the FERC must show that importation of Alberta gas is "necessary or related to the construction and initial operation of" Alaska natural gas transportation facilities running from the United States-Canadian border east and west across the lower 48 states.[51]
 
 
 54
 Midwestern and Michigan Wisconsin correctly point out that the Commission did not rely on the "necessary or related" language in its orders to justify its authority under section 9 of the ANGTA. Therefore, they argue, this Court must not accept the FERC's Post hoc rationalization, "for an agency's order must be upheld, if at all, on the same basis articulated in the order by the agency itself."[52]
 
 
 55
 Although agency action must be set forth with sufficient clarity so that courts do not have to guess at the underlying theories relied on,[53] this Court has recognized judicial indulgence toward administrative action to the extent of affirming an order when an agency's path, though convoluted, can be discerned.[54] The FERC's failure explicitly to employ the "necessary or related" phrase did not mask its intent to rely on section 9 of ANGTA as the authority for its decisions. The Commission stated clearly in its June 7 order that it complied with the congressional mandate to expedite under sections 9(a) and (b) of the ANGTA.[55] In the July 24 and August 4 orders, the Commission was equally as explicit about its reliance on the ANGTA, noting that its review of petitions for reconsideration was strictly discretionary because "section 10 of the (ANGTA) makes no provision for rehearing."[56] Thus, while the Commission's failure to reveal its mental processes openly and directly gives us pause, we nevertheless find that its arguments are properly based on section 9 of the ANGTA.
 
 
 56
 Midwestern's and Michigan Wisconsin's principal argument is that importation of Canadian gas into the United States is not "necessary or related to" the ANGTS, because passage of the ANGTA and selection of the Alcan Project was to facilitate transportation of natural gas from Prudhoe Bay, and importation of Canadian gas has no relation to transportation of Alaskan gas. We disagree.
 
 
 57
 The absence of any specific reference to Canadian gas in the ANGTA is understandable because the Act was passed prior to the President's Decision approving the Alcan Project. Any reference to Canadian gas in the Act might have revealed prejudgment in favor of an overland route through Canada and against El Paso Alaska's proposal to ship liquified natural gas from Alaska to California. Nevertheless, Congress appears to have recognized that if a transportation system through Canada were chosen, use of those facilities for Canadian gas imports was a definite possibility.[57]
 
 
 58
 Section 5(c)(4) of the ANGTA, for example, requires that the FERC consider "the extent to which the system provides a means for the transportation to United States markets of Natural resources or other commodities from sources in addition to the Prudhoe Bay Reserve."[58] The Senate Report accompanying the ANGTS legislation clarifies congressional interest in the relationship between importation of Canadian gas and construction of an ANGTS. The Report indicates that the FERC must consider the scope of the ANGTS transport capabilities, recognizing that "substantial additional supplies of natural gas may be available for delivery to the United States from areas on the north slope of Alaska other than the Prudhoe Bay reserve and from other areas of Alaska and Canada."[59]
 
 
 59
 In addition to the legislative indices that proposed imports are "necessary or related to" the ANGTS, Northwest's application to the FERC contains the unchallenged assertion that "said contract is, by its terms, expressly tied to the prebuilding of part of the southern portion of the Alaska natural gas transportation system."[60] Northwest also pointed out that "substantially all of the transportation facilities to be constructed will be segments of the facilities contemplated in both the President's and NEB's decisions approving the overall Projects."[61] Moreover, the applications state that both the imports and the prebuilding of facilities will greatly reduce the costs of transportation of Alaska gas.
 
 
 60
 First . . . the installation of facilities in both the United States and Canada at an earlier date will result in lower costs because of less inflation and the facilities will begin being depreciated earlier with a consequent reduction in rate base and resulting cost of service when the Alaskan gas comes on stream. Second, the total construction program for the Alaska Highway Pipeline Project (Alcan Project) will be spread out over a greater period of time which will lessen the impact of the project on availability of labor, materials, and capital.[62]
 
 
 61
 Finally, the President's Decision and accompanying material show that importation of Canadian gas is related to the ANGTS. While the Decision clearly is not a specific endorsement of Northwest's contract, and does not represent a firm executive commitment in favor of predeliveries of Canadian gas, the President does recognize, and the NEB agrees,[63] that the Alcan system will
 
 
 62
 provide the opportunity to obtain additional gas at an earlier date by early construction of portions of the Southern Canadian and lower 48 sections of Alcan, with delivery of gas from Alberta (where there is a temporary excess supply) in advance of the delivery of Alaska gas.[64]
 
 
 63
 The Commission thus was justified in finding that imports like those proposed by Northwest are "a material element in the overall desirability"[65] of the Alaska natural gas transportation system, and while arguably not "necessary" to the construction and initial operation of the transportation system, such imports alternatively are "related to" it.
 
 B. Authority under the Natural Gas Act
 
 64
 The Commission's orders, though issued under the procedural framework of the ANGTA, were substantively based on section 3 of the Natural Gas Act.[66] Mid western and Michigan Wisconsin challenge this aspect of the Commission's authority, claiming that the Secretary of Energy, who had power to administer section 3 under the Department of Energy Organization Act (DOE Act),[67] has delegated[68] the international policy-making aspect of import approval to the Administrator of the Economic Regulatory Administration, and not to the FERC.[69]
 
 
 65
 Contrary to petitioners' position, we find that the Secretary of Energy has indeed delegated to the Commission the authority to carry out any function which the FPC could have performed before passage of the DOE Act "with respect to any approved transportation system (within the meaning of Section 4 of the ANGTA)."[70] Because the proposed imports of Alberta gas are "related to" or "with respect to" the ANGTS, and because the FPC clearly had authority to grant import applications under section 3 prior to the DOE Act, the FERC's grant of conditional authorization under section 3 was proper and consistent with the Secretary's delegation.
 
 IV. RIPENESS
 
 66
 The ANGTS is an unusually complex, multi-faceted project, and Northwest's import application is just one component in the entire project. The Commission repeatedly has stated that it has "conditionally authorized" Northwest's import proposals under section 3 of the Natural Gas Act, but the effect of this action is unclear. We must decide whether the Commission has merely "stimulate(d) the expeditious processing of all government approvals, not only for the gas imports which are the subject of the instant applications, but also for the remainder of the ANGTS,"[71] or whether it actually has made some concrete, definitive decisions that effectively terminate its consideration of certain components of the overall project. Also, we must determine whether the Commission's actions have had a direct impact on petitioners and complainant, or have only affected Northwest by allowing it to file the next set of applications. These are ripeness considerations.
 
 
 67
 We note preliminarily that the FERC specifically refrained from ruling on several matters, including questions of certification of Northwest's resale of imported gas under section 7 of the Natural Gas Act,[72] possible Canadian changes in the price of gas to be sold to Northwest, and methods for shippers' pricing of imported gas.[73] These questions will not be reviewed.
 
 
 68
 What the Commission did find, at least tentatively, as part of its conditional authorization order, and what petitioners and complainant challenge, is that the resale restriction in Northwest's contracts does not violate either the federal antitrust laws or the ANGTA, that importation of the proposed amounts of Alberta gas is in the public interest,[74] and that Northwest's contracts are not competitive with existing contracts for importation of Canadian gas, so that a declaration of priority for extension or renewal of existing contracts is unwarranted.[75] Challengers also claim that their statutory and constitutional rights have been violated by the FERC's failure to hold hearings before conditionally authorizing Northwest's contracts. The FERC and numerous intervenors claim that these issues are not ripe for review.
 
 
 69
 The doctrine of ripeness has evolved from a matter of complicated legal distinctions[76] to a matter of "practical common sense."[77] Abbott Laboratories v. Gardner,[78] the leading case on the subject, articulated the "basic rationale" underlying the doctrine:
 
 
 70
 to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.
 
 
 71
 The Supreme Court in the same case also prescribed a two-part test for deciding whether an agency action is ripe for review, requiring courts "to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.[79]
 
 
 72
 Ultimately, what we must determine under this test is whether the agency action is sufficiently final or definitive so that we would have no interest in postponing review until the issues are more concrete. If the court's interest tends toward postponement, we must then weigh this consideration against the immediate impact of the actions on the challengers, and whether that impact is so harmful that present consideration is warranted.[80] The first factor comports with the first prong of the Abbott Laboratories test; the latter with the second prong.
 
 
 73
 We will begin our analysis by discussing each of the challenged "findings"[81] separately under the first prong of the Abbott Laboratories test.
 
 A. Fitness for Judicial Decision
 
 74
 1. Decision on Contract's Resale Restriction
 
 
 75
 The Northwest-Pan-Alberta contracts provides that the seller, Pan-Alberta, may terminate the contracts prior to commencement of construction of new facilities if Northwest resells the imported gas to any purchaser not participating in the construction of the Alaska portion of the ANGTS.[82] An intervenor contended that this resale restriction is an illegal restraint of trade under section 1 of the Sherman Act, and that it violates section 13(a) of the ANGTA by preventing transporters of natural gas from full access to the ANGTS on the basis of ownership of the system. Although that intervenor later withdrew its complaint, the Commission chose to address the charge. Relying partly on the assumption that the resale provision is required by a Canadian governmental or provincial policy, the Commission found that the provision does not violate either the Sherman Act or the ANGTA.[83] The issue now facing the Court is whether such a Canadian policy exists a purely factual question that does not lend itself as readily to prompt judicial review as a purely legal question.[84]
 
 
 76
 Moreover, the FERC's decision does not preclude a subsequent submission of evidence negating the assumed fact. On the contrary, the Commission freely admitted that it is willing to reconsider the antitrust implications of the contracts, and presumably the ANGTA determination as well, should Canadian policy, if any, differ from the FERC's "assumption."[85] The existence of a Canadian policy requiring the contracts' resale restriction is in fact a condition, the failure of which may prompt the Commission to modify or abandon its present position on the validity of the resale restriction[86] and to reexamine its findings under section 3 of the Natural Gas Act.[87] We therefore conclude that the decisions on the resale restriction do not represent the Commission's final position, and judicial review at this time would be premature.
 
 2. Public Interest Determination
 
 77
 The Commission reviewed Northwest's import applications under section 3 of the Natural Gas Act. Northwest lacked all of the required exhibits[88] when it submitted its applications, and under different circumstances, the Commission might have waited until all the information was before it. Congress requires expedited consideration of all applications related to the ANGTS, however,[89] so that the Commission considered the import proposals immediately. The result is the finding under the Natural Gas Act that conditional authorization of the imports is not inconsistent with the public interest[90] because the desirability of importing Alberta gas is clear[91] and importing the gas through pre-built portions of the ANGTS will help expedite completion of the entire transportation system. Conditional authorization, according to the Commission, encompasses no ruling on "any matters related to the import authorization applications other than the basic question of whether In general such imports are in the public interest."[92]
 
 
 78
 The Commission has reserved for future consideration or reconsideration several questions related to the section 3 authorization of the imports, including its antitrust determination that is "intimately involved" with the section 3 public interest determination.[93] The Commission also has reserved consideration of Northwest's application under section 7 of the Natural Gas Act,[94] and certification under section 7 normally is necessary before final approval of an import authorization.[95] Despite these open questions, however, the Commission has made its public interest determination.
 
 
 79
 This action is final. There is no hint that the ruling is tentative, and the FERC is unlikely to reconsider its decision before it completes the necessary future proceedings under the Natural Gas Act.[96] In addition, the issue facing the Court involves the purely legal question whether the FERC exceeded its statutory authority in making a "general" finding that imports are in the public interest without completing proceedings under section 3 or section 7 of the Natural Gas Act. The issue also requires an analysis of the factual basis for the public interest determination, but these facts will not necessarily become more concrete with time.
 
 
 80
 Whether an issue is fit for judicial review does not depend on finality alone,[97] and in this instance, we find that the factors supporting judicial resolution are outweighed by other considerations. Because so many questions are still undecided, and several other issues are open to reexamination by the FERC, it is wiser and more efficient to allow the Commission to continue its decision-making process at least until it grants final authorization, if any, for Northwest's import application. Exhaustion of this administrative process will refine and focus the factual basis upon which both the public interest determination and the overall authorization rest, and will avoid a multiplicity of suits challenging conditional, tentative Commission decisions. If, after final authorization, the challengers claim competitive injury or violation of rights, judicial review will be available, and this Court at that juncture will be better able to analyze the legal and factual questions presented.[98] We therefore conclude that the public interest determination, although final, is not fit for judicial review, and we will withhold consideration unless we find, under the second prong of the Abbott Laboratories test, that such action will harm the challengers.
 
 3. Priorities and Lack of Competition
 
 81
 The Commission declined to recognize that existing Canadian gas importers have priority over importers like Northwest that intend to use ANGTS facilities. The basis for this action was the finding that the needs of the existing importers and those of Northwest Currently are not competitive.[99] Although at first blush, both of these actions appear definitive, we need only point to the Commission's own assertion that its conditional authorization constitutes no ruling on, and therefore reserves for possible further deliberation, all matters relating to the import applications except the question whether in general the imports are in the public interest.[100] The finding of no competition, and the failure to declare priorities for extension and renewal of existing contracts, are therefore tentative actions, and we have a great interest in postponing judicial review until these issues arise in a more concrete and final form.
 
 4. Denial of Hearing
 
 82
 The Commission decided not to hold hearings before issuing its conditional authorization order, and when the challengers petitioned for clarification or rehearing of that order, the Commission denied their requests. The challengers now claim that this denial violated their constitutional and statutory rights on two grounds: (1) competitive hearings were required under the Ashbacker doctrine,[101] and (2) section 3 of the Natural Gas Act, under which the FERC issued the order, requires a hearing before an application for importation of natural gas may be conditionally authorized. Upon close examination of these two grounds, we find that the challengers' claim under the Ashbacker doctrine is unfit for immediate judicial review, but the claim under the Natural Gas Act is reviewable.
 
 
 83
 In Ashbacker Radio v. FCC,[102] the Supreme Court held that
 
 
 84
 where two Bona fide applications are mutually exclusive the grant of one without a hearing to both deprives the loser of the opportunity which Congress chose to give him.[103]
 
 
 85
 We do not reach the issue of mutual exclusivity at this time because the FERC has not made a final decision on Northwest's import applications, nor has it foreclosed the possibility of future hearings on the issue of competition or mutual exclusivity between Northwest and the challengers. Therefore, the Ashbacker doctrine is not yet applicable to this case.[104] Of course, our present decision will not preclude judicial review if a future decision by the Commission should foreclose an effective competitive hearing.[105] At the present time, however, the Commission's decision not to hold hearings is not sufficiently final to warrant review under Ashbacker.
 
 
 86
 The challengers' claim under section 3 of the Natural Gas Act is on a different footing. Here the Commission has made a final determination, without hearings, that imports from Alberta generally are in the public interest, and it has already declined to reopen the matters. Moreover, the issue facing the Court involves a purely legal question: whether the Commission exceeded its statutory authority under section 3 by failing to hold hearings before finding that natural gas imports from Alberta generally are in the public interest. This issue is therefore reviewable, and because we have no interest in postponing consideration, we need not move to the second prong of the Abbott Laboratories test to determine whether the challengers would be harmed by such postponement.
 
 
 87
 5. Conclusion on Fitness for Judicial Decision
 
 
 88
 We find that the Commission's decision not to hold hearings prior to authorizing conditionally Northwest's import application under section 3 of the Natural Gas Act is fit for judicial review under the Abbott Laboratories test. The Commission's findings on the validity of the resale restriction in Northwest's contracts, and on the lack of competition between the challengers and Northwest, as well as the failure to hold competitive hearings under the Ashbacker doctrine, are part of a continuing decisionmaking process that has not yet resulted in final decisions. The public interest determination, although final, is unfit for immediate judicial review because of considerations of efficiency, and because further action by the Commission will focus the issues.
 
 B. Hardship to the Parties
 
 89
 Turning to the second prong of the Abbott Laboratories test, we must ascertain the immediate harm, if any, to the challengers by withholding court consideration. For convenience, we will treat together the substantive decision on the resale restriction, the public interest decision, and the finding of no competition, because consideration of the impact from these decisions is the same in all cases. The Commission's decision not to hold hearings under the Ashbacker doctrine involves different factors, and will be treated separately.
 
 1. Substantive Determinations
 
 90
 Midwestern and Michigan Wisconsin claim that if Canadian gas reserves dwindle in the near future, the Canadian NEB may well be reluctant to issue export licenses for both Northwest's proposed contracts and existing contracts that will come up for renewal in the late 1980's. Therefore, they argue, because the FERC's conditional authorization allegedly signals to Canada that the United States favors new imports through prebuilt portions of the ANGTS over existing imports, the NEB probably will grant new import applications and deny renewal of existing ones.
 
 
 91
 This alleged injury falls far short of what is required to overcome the Court's interest in denying consideration until the issues are more sharply defined. First, the potential injury is too speculative to warrant immediate review.[106] The challengers' litany of hardships caused by the conditional authorization is explicitly dependent on hypothetical natural gas shortages in Canada,[107] followed by a hypothetical Canadian decision to reduce gas exports by cutting off supplies to the challengers. We agree that there is some support for these speculations,[108] but there is equally as much support for the hypothesis that prebuilding of the ANGTS will assist Canada to continue exporting gas to the United States by providing it with access to MacKenzie Delta reserves.[109] Moreover, the allegations of the parties do not prove or disprove the proposition that the FERC's decisions are a "signal" to Canada to favor newer export applications related to the ANGTS over existing export applications. Even assuming that the Commission has intended to signal Canada, it is unlikely that Canada's NEB would follow such a "signal." The NEB previously has made clear its intention to preserve the integrity of its own proceedings, and we have every reason to believe that our neighbor will continue to make export decisions based on its own national interest.[110]
 
 
 92
 Second, if this alleged inquiry is certain, it is still future injury that may not affect the challengers for several years. They have failed to demonstrate that the effect of the conditional authorization has been "felt in a concrete way" today.[111] The Commission has denied them no rights, nor has it imposed any obligations on them.[112] Complainant and petitioners are operating under authorized import contracts that have not been revoked or modified in any way, they have not suggested that they wish to purchase imported gas from Northwest and thus cannot assert they have been or will be precluded should they desire to do so, and renewal of their existing contracts will not be necessary for several years. Even the definitive finding that imports from Alberta are generally in the public interest has not denied them any right, because Northwest's actual importation and sale of the gas has not yet been finally approved. On the other hand, the challengers are not covered by the Commission's order at all, so that they need not act in a manner that would cause injury cognizable by this Court.[113] Northwest is the only company which has an obligation at this time it must submit the remaining information required under section 3 of the Natural Gas Act, and prepare its application under section 7 of the same Act. For these reasons, we conclude that the Commission's findings have no "immediate and practical impact"[114] on the challengers and no "direct effect on (their) day-to-day business" that the Supreme Court found present in Abbott Laboratories.[115]
 
 
 93
 Midwestern and Michigan Wisconsin argue somewhat more persuasively that the Commission's present decisions are the first in an unbreakable chain of events that will progress until final authorization. If complainant and petitioners are forced to wait for the Commission's "future final authorization" before review, they claim that the Canadian government probably will have acted on Pan-Alberta's export application, and a reversal of the Commission's decision at that time allegedly will not affect the Canadian commitment. Thus, judicial review will be meaningless.
 
 
 94
 We agree that the Commission's conditional authorization is an important first step in a chain of events which undoubtedly will, as the FERC hopes, generate "the salutary effect of stimulating the expeditious processing" of the numerous government authorizations both in this country and in Canada.[116] We disagree, however, with the claim that the chain of events is unbreakable. First, it is pure speculation to claim that once Canada approves Pan-Alberta's export application, it will not reverse its decision if the FERC fails to grant final authorization to Northwest's import application, or if its final authorization is reversed by this Court or the Supreme Court. The Canadian government is just as likely to reconsider or vacate its prior approval, if to do so is in its national interest. Second, the present relationship of the parties is likely to change in the next few years, and the Commission may interrupt the chain of events by modifying or reversing aspects of its present decision. Canadian policy regarding natural gas exports may also change, prompting reevaluation of energy policy in this country.
 
 
 95
 Even if we assume that the weight of each agency approval makes reconsideration or reversal of prior approvals less likely, this assumption does not mean that the challengers can no longer participate in the administrative proceedings. They will certainly be able to participate in the FERC's proceeding on certification under section 7 of the Natural Gas Act,[117] which proceeding treats many of the same types of issues raised today.[118] They also will be able to participate in the Canadian government's consideration of the Northwest-Pan-Alberta export application.[119]
 
 
 96
 In sum, there is very little, if any, hardship to the challengers by denying immediate review of their substantive challenges to the FERC's orders. The orders have no direct impact on the day-to-day business of the challengers, the future harmful impact of the orders is speculative at best, the Commission may reconsider several of its present findings, and the challengers will have opportunities to participate in hearings in this country and in Canada prior to final authorization of the import application.
 
 2. Decision Not to Hold Hearings
 
 97
 The Commission's decision not to hold hearings need only be analyzed under the Ashbacker doctrine,[120] for we have already found that the question of hearings under section 3 of the Natural Gas Act is fit for judicial review. Under Ashbacker, a party must show the mutual exclusivity of two bona fide applications before a competitive hearing is required.[121] This Court has interpreted the phrase "mutually exclusive" in terms of economic fact,[122] and has held that mutual exclusivity should be determined at the time the applications are being considered.[123] In Ashbacker, mutual exclusivity was an established, uncontroverted fact,[124] whereas in the present case, the challengers have not shown indeed they have hardly attempted to show that Northwest's import applications are necessarily mutually exclusive of existing import contracts. They merely speculate as to a possible future conflict,[125] and much of that conflict involves the hypothetical clash in Canada between a Canadian exporter seeking a new export license to sell to the challengers, and Pan-Alberta seeking authority to sell to Northwest.[126] Therefore, challengers have not shown that the FERC's refusal to hold hearings has deprived them of their right to an effective competitive hearing.[127]
 
 
 98
 Furthermore, the Commission has taken no final action regarding the hearings. We accept the Commission's representations in its June 7 order[128] and in its brief in this case,[129] that it will hold future competitive hearings should the challengers allege, at the time they seek agency review, that their import licenses and Northwest's are mutually exclusive.[130] We thus conclude that failure to hold hearings has not caused sufficient hardship to the challengers to warrant our immediate review under the Ashbacker doctrine.
 
 C. Conclusions on Ripeness
 
 99
 Under the Abbott Laboratories two-pronged test, we find that the Commission's failure to hold hearings under section 3 of the Natural Gas Act is the only issue ripe for review. We withhold consideration on all other issues for several reasons. First, the findings on the validity of the resale restriction in Northwest's contract are conditional, and the challengers will suffer no hardship if judicial review is withheld until the issues are more concrete. Second, the Commission's findings that Northwest's import applications are not competitive with existing import licenses and that no priorities need to be declared, are open for further consideration. In addition, these findings have no immediate impact on the challengers, and the alleged future impact is merely speculative. Third, the public interest determination is final but unfit for judicial review, and the decision does not have any immediate harmful impact on the challengers. Finally, the Commission's failure to hold an Ashbacker hearing is not a final action, and the challengers will suffer no hardship if judicial review is postponed until the Commission takes some action that definitively precludes the possibility of an effective competitive hearing.
 
 
 100
 V. REVIEW OF DENIAL OF A HEARING PRIOR TO CONDITIONAL AUTHORIZATION
 
 A. Standard of Review
 
 101
 The FERC's authority to authorize conditionally Northwest's contracts stems from two statutes, the ANGTA and the Natural Gas Act. This dual system of regulatory control raises the possibility of two types of judicial review.[131] Upon closer examination of the ANGTA, however, we find that Congress has foreclosed that possibility, and has mandated judicial review solely under the ANGTA.[132] Section 10 of the ANGTA provides:
 
 
 102
 Notwithstanding any other provision of law, the actions of Federal officers or agencies taken pursuant to section (9) of this Act, shall not be subject to judicial review except as provided in this section.[133]
 
 
 103
 We already have determined that Northwest's proposed importation of Alberta gas is "related to" the ANGTA, as provided in section 9 of the Act.[134] Therefore, the FERC necessarily acted "pursuant to section 9" in conditionally authorizing Northwest's import contracts, and the Commission's actions are subject to exclusive judicial review under section 10 of the ANGTA. Under these circumstances, we dismiss for lack of jurisdiction Midwestern's and Michigan Wisconsin's petitions for review filed under section 19(b) of the Natu ral Gas Act.[135] We review only Midwestern's complaint filed under the ANGTA.
 
 
 104
 Review under the ANGTA does not undercut the quality of the Commission's action under the Natural Gas Act, because Congress envisioned that agencies would act pursuant to provisions of the ANGTA, while at the same time those agencies would issue certificates or authorizations "to the fullest extent permitted by the Provisions of law administered by such officer or agency."[136] The scope of our review under the ANGTA, however, is far more restricted than that under the Natural Gas Act. Such a limitation is in keeping with the congressional purpose of expediting procedures in the selection construction, and initial operation of the ANGTA.[137] This Court is to decide, in the first instance, "claims alleging that an action will deny rights under the Constitution of the United States, or that an action is in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."[138] The intent of this provision is elucidated in a House Report that notes:
 
 
 105
 The Court (of Appeals for the District of Columbia Circuit) is to look to see if the action is taken within the agency's authority. It is not intended that the Court would have jurisdiction to look behind the agency decision to examine its reasonableness or determine whether it is adequately supported by the record of any proceedings as may have occurred before the agency.[139]
 
 
 106
 This limitation on the Court's reviewing authority is significant. When an agency has exercised its discretion, as the FERC has done in this case, we may not consider the reasonableness of that action or the substantiality of the evidence supporting it.[140] As long as the FERC has acted within relevant statutory and constitutional bounds, we must affirm its action.
 
 B. Right to Hearing
 
 107
 The only issue ripe for review is the challengers' claim that the FERC's denial of a hearing prior to authorizing conditionally Northwest's contracts was beyond its statutory authority and violative of the parties' rights. Midwestern, as the sole complainant in this case, has standing to raise this claim because it has alleged a judicially cognizable "injury in fact"[141] in the denial of a hearing allegedly required under the Natural Gas Act. In addition, Midwestern is within the "zone of interests"[142] to be protected by the ANGTA because it has filed a claim alleging that the FERC's failure to hold a hearing has denied rights under the Constitution and has exceeded the Commission's statutory authority.[143]
 
 
 108
 Midwestern and several intervenors claim that they have a statutory right to a hearing under section 3 of the Natural Gas Act, which provides:
 
 
 109
 (N)o person shall . . . import any natural gas from a foreign country without first having secured an order of the Commission authorizing it to do so. The Commission shall issue such order upon application, unless . . . it finds that the proposed . . . importation will not be consistent with the public interest. The Commission may by its order grant such application, in whole or in part, with such modification and upon such terms and conditions as the Commission may find necessary or appropriate, and may from time to time, after opportunity for hearing, and for good cause shown, make such supplemental order in the premises as it may find necessary or appropriate.[144]
 
 
 110
 They interpret this section as requiring that a hearing be held before a permit is granted, but they ignore the distinction between an original authorization order and a supplemental order. Section 3 mandates a hearing before the Commission issues a supplemental order, subjecting previously authorized imports to additional "terms and conditions."[145] Section 3 does not mandate a hearing before the Commission authorizes the application "in whole or in part." When the Commission intends to authorize an application, it "shall issue" its authorization order, and need not hold a hearing unless it intends to deny authorization of a proposed import. In the present case, the Commission authorized Northwest's import application "in part" by finding that the imports generally are in the public interest. No hearing was required prior to this conditional authorization.
 
 
 111
 On a constitutional level, "the demands of due process do not require a hearing, at the initial stage or at any particular point or at more than one point in an administrative proceeding so long as the requisite hearing is held Before the final order becomes effective."[146] In the present case, we have explained that the Commission has made a final, though presently unreviewable decision that the imports generally are in the public interest under section 3 of the Natural Gas Act.[147] The Commission has not granted final authorization for Northwest's proposed imports under section 3, however, because it has not received all the necessary documents.[148] Furthermore, final authorization for all aspects of Northwest's import application cannot be granted until the Commission completes proceedings under section 7 of the Natural Gas Act. Therefore, no final order as to Northwest's import application has yet become effective. A hearing must be granted before such final order is considered. Until that stage of the proceedings is reached, the Commission is justified in dispensing with a hearing.
 
 VI. CONCLUSION
 
 112
 The Commission acted in this case pursuant to the procedural requirements of the ANGTA and the substantive requirements of the Natural Gas Act. We affirm the Commission's assumption of jurisdiction under both of those Acts. Because the Commission's actions fall under the ANGTA, this Court's jurisdiction to review the FERC's actions is solely under the limited judicial review provisions of the ANGTA, and we therefore dismiss the petition for review filed under the Natural Gas Act. Turning to the merits, we dismiss as not ripe the challenges to the Commission's decisions on the validity of the resale restriction in Northwest's contracts, the public interest, competition and priorities, and competitive hearings. The only issue ripe for review is whether the Commission unlawfully refused to hold a hearing prior to issuing a conditional authorization. We affirm the Commission's action, finding it within the bounds of the Constitution and section 3 of the Natural Gas Act.
 
 
 113
 It is So Ordered.
 
 
 
 [1]
 15 U.S.C. §§ 719-719o (1976)
 
 
 [2]
 Id. §§ 717-717w
 
 
 [3]
 Id. § 719h(c)(2)
 
 
 [4]
 S. Rep. No. 94-1020, 94th Cong., 2d Sess. 3-4 (1976)
 
 
 [5]
 Id. at 6
 
 
 [6]
 On October 1, 1977, most of the powers formerly exercised by the FPC were transferred to the FERC. Department of Energy Organization Act (DOE Act), 42 U.S.C.A. §§ 7101-7352 (Supp.1977). When the term "Commission" is used in this opinion, it will refer to the FPC prior to October 1, 1977, and to the FERC after that date
 
 
 [7]
 Effective January 1, 1978, Alcan Pipeline Company changed its name to Northwest Alaskan Pipeline Company
 
 
 [8]
 For a detailed description of the three proposals, see FPC Recommendation to the President, Alaska Natural Gas Transportation Systems, at II-1-19 (May 1, 1977)
 
 
 [9]
 Pub.L. No. 94-586, 90 Stat. 2912 (1976)
 
 
 [10]
 15 U.S.C. § 719a (1976)
 
 
 [11]
 Id. § 719c
 
 
 [12]
 Id. § 719d
 
 
 [13]
 Id. § 719e
 
 
 [14]
 Id. § 719f
 
 
 [15]
 Id. § 719g
 
 
 [16]
 Id. § 719h
 
 
 [17]
 FPC Recommendation to the President, Alaska Natural Gas Transportation Act (May 1, 1977)
 
 
 [18]
 Id. at I-21
 
 
 [19]
 National Energy Board, Reasons for Decision, Northern Pipelines (1977) (NEB Decision). The NEB referred to the Canadian portion of the Alcan Project as the "Foothills (Yukon) Project" because Foothills Pipe Lines (Yukon) Ltd. proposed the construction and operation of the related Canadian facilities
 
 
 [20]
 NEB Decision, vol. 1, at 161-62
 
 
 [21]
 This Agreement is reprinted in full in the President's Decision at 47-83
 
 
 [22]
 The President's Decision was issued pursuant to section 7 of the ANGTA, 15 U.S.C. § 719e (1976)
 
 
 [23]
 Congress did not specifically approve the Overview or the Report accompanying the President's Decision, although the actual decision and all accompanying material were submitted to Congress on September 22, 1977. S.Rep. No. 95-567, 95th Cong., 1st Sess. 10-11 (1977). The Overview and Report are at least an authoritative legislative history
 
 
 [24]
 "Pre-delivery" means delivery of Canadian gas before delivery of Alaskan gas
 
 
 [25]
 Report accompanying the President's Decision
 
 
 [26]
 15 U.S.C. § 719f (1976)
 
 
 [27]
 FERC, Comments on the Decision and Report to Congress on the Alaska Natural Gas Transportation System Issued by the President, at 6-7 (Oct. 1977)
 
 
 [28]
 Id
 
 
 [29]
 H.R.J.Res. 621, Pub.L. No. 95-158, 91 Stat. 1268, 95th Cong., 1st Sess. (1977)
 
 
 [30]
 FERC Order in Docket Nos. CP78-123 Et al. (Dec. 16, 1977), J.A. at 1. Conditional certificates were awarded to Alcan Pipeline Company to construct the Alaskan facilities, to Northern Border Pipeline Company to construct the facilities from the Saskatchewan-Montana border to Dwight, Illinois (the Eastern Leg) and to Pacific Gas Transmission Company to construct the pipeline from the British Columbia-Idaho border into California (the Western Leg). Id. at 2 n.3
 
 
 [31]
 See Northwest-Pan-Alberta Contract § 2.1, March 9, 1978, J.A. at 53. Section 2.1 provides:
 The parties represent that this Agreement is necessary to permit prebuilding of part of the southerly portions of the facilities required for the Alaska Highway Pipeline Project. Accordingly, insofar only as the arrangement for the sale and purchase of gas hereunder is contemplated, the parties shall cooperate together to facilitate the ultimate approval, financing, construction and operation of such portions of the Alaska Highway Pipeline Project. The volumes of gas to be delivered hereunder are early deliveries contemplated in the Recommendation of the U.S. President and in the Decision of the Canadian National Energy Board regarding the Alaska Highway Pipeline Project. As an integral portion of the Alaska Highway Pipeline Project this arrangement in the U.S.A. is subject to the provisions of the Alaska Natural Gas Transportation Act of 1976. Because of the importance of insuring the success of the prebuilding of portions of the Alaska Highway Pipeline Project, no other provision herein shall be construed in a way which is contrary to this representation.
 
 
 [32]
 43 Fed.Reg. 16805 (1978)
 
 
 [33]
 Pacific Refining Company's request for a hearing was denied because it challenged the merit of increased gas imports from Alberta, which merit the FERC indicated was beyond dispute. See FERC Order in Docket Nos. CP 78-123 Et al. at 3 (June 7, 1978) (June 7 Order), J.A. at 101
 
 
 [34]
 Id. at 102. Northwest must receive a certificate of public convenience and necessity under section 7 of the Natural Gas Act, 15 U.S.C. § 717f (1976), prior to final authorization
 
 
 [35]
 June 7 Order, J.A. at 102
 
 
 [36]
 Id
 
 
 [37]
 Id., J.A. at 104
 
 
 [38]
 Northwest-Pan-Alberta Contract § 2.8, March 9, 1978, J.A. at 57. Section 2.8 provides:
 Inasmuch as (i) the most viable way to proceed with the Alaska Highway Pipeline Project will be for the prebuilding contemplated in connection herewith, (ii) the gas made available hereunder is vitally needed for U.S. markets prior to the availability of Prudhoe Bay gas, and (iii) the Alaska Highway Pipeline Project should be supported by markets in the U.S. benefiting from deliveries hereunder, this contract may be terminated by Seller as to the applicable portion of the quantities of Alberta gas sold hereunder, if at any time prior to the commencement of construction of major new facilities or additions to existing facilities necessary in connection herewith:
 (a) Buyer resells the gas to any U.S. Purchaser who is not a Partner (or whose Parent, affiliate or subsidiary is not a Partner) in the Partnership established to effectuate the Alaska portion of the Alaska Highway Pipeline Project; or
 (b) Any such U.S. Purchaser (or their Parent, affiliate or subsidiary who is the Partner) purchasing gas from Buyer withdraws from the Partnership established to effectuate the Alaska portion of the Alaska Highway Pipeline Project.
 
 
 [39]
 Section 13(a) of the ANGTA provides that no person seeking to transport natural gas through the Alaska natural gas transportation system shall be discriminated against on the basis of ownership, or lack thereof, of the transportation system. 15 U.S.C. § 719k (1976)
 
 
 [40]
 Id. § 1
 
 
 [41]
 June 7 Order, J.A. at 105. The assumed Canadian policy was thought to require that natural gas be exported to the United States only if it was to support the ANGTS. Id
 
 
 [42]
 FERC Order in Docket Nos. CP78-123 Et al. (July 24, 1978) (July 24 Order), J.A. at 174
 
 
 [43]
 FERC Order at Docket Nos. CP78-123 Et al. (Aug. 4, 1978) (August 4 Order), J.A. at 178
 
 
 [44]
 15 U.S.C. § 717r (1976)
 
 
 [45]
 Id. § 719g
 
 
 [46]
 Application of Northwest Alaskan Pipeline Company for a Conditional Order Authorizing the Importation of Natural Gas from the Dominion of Canada, Docket No. CP78-123 (Apr. 5, 1978), J.A. at 14-89. Northwest submitted its application pursuant to sections 5(a)(2) and 9 of the ANGTA, 15 U.S.C. §§ 719c(a)(2), 719g (1976)
 
 
 [47]
 June 7 Order, J.A. at 102
 
 
 [48]
 15 U.S.C. § 719g (1976)
 
 
 [49]
 Id. § 717b
 
 
 [50]
 Id. § 719g (emphasis added)
 
 
 [51]
 See ANGTA § 7, 15 U.S.C. § 719e (1976) (term "construction and initial operation" under section 9 of the ANGTA explained in President's Decision ); President's Decision, at 13-22 (two branches of pipeline running from United States-Canadian border west to California and east to Illinois deemed "necessary for construction and initial operation" of ANGTS; entitled to expedited issuance of authorization under section 9 of the ANGTA)
 
 
 [52]
 FPC v. Texaco, Inc., 417 U.S. 380, 397, 94 S.Ct. 2315, 41 L.Ed.2d 141 (1974) (citing Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168-69, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)); See SEC v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947) (if grounds invoked by agency are inadequate to justify administrative judgment, court may not affirm judgment by substituting what it considers more proper basis)
 
 
 [53]
 SEC v. Chenery Corp., 332 U.S. 194, 196-97, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947); WAIT Radio v. FCC, 135 U.S.App.D.C. 317, 320, 418 F.2d 1153, 1156 (1969)
 
 
 [54]
 WAIT Radio v. FCC, 135 U.S.App.D.C. 317, 320, 418 F.2d 1153, 1156 (1969); Cf. Colorado Interstate Gas Co. v. FTC, 324 U.S. 581, 595, 65 S.Ct. 829, 89 L.Ed. 1206 (1945) (findings of agency "leave much to be desired," but agency's path can be discerned, and case need not be remanded for further findings)
 
 
 [55]
 June 7 Order, J.A. at 102, 103 n. 9
 
 
 [56]
 July 24 Order, J.A. at 173 n. 1; August 4 Order, J.A. at 178 n. 2
 
 
 [57]
 Indeed, in 1975, Michigan Wisconsin argued to this Court that the Arctic Gas Project, which was ultimately rejected, reasonably could be used to transport Canadian gas into the lower 48 states. See Michigan Wisconsin Pipe Line Co. v. FPC, 171 U.S.App.D.C. 352, 356, 520 F.2d 84, 88 (1975) (substantial amounts of gas likely to flow from MacKenzie Delta area through Arctic Gas Project facilities)
 
 
 [58]
 15 U.S.C. § 719c(c)(4) (1976) (emphasis added)
 
 
 [59]
 S.Rep. No. 94-1020, 94th Cong., 2d Sess. 15-16 (1976)
 
 
 [60]
 Application of Northwest Alaskan Pipeline Company for Conditional Order Authorizing the Importation of Natural Gas from the Dominion of Canada to Permit Early Construction of a Portion of the Eastern Leg of the Alaska Natural Gas Transportation System, Docket No. CP78-123 (Apr. 5, 1978), J.A. at 18; See id. at 15 (proposed importation to facilitate pre-building of portions of facilities necessary to transport Alaska gas to lower 48 states)
 
 
 [61]
 Id. at 18
 
 
 [62]
 Id. at 17
 
 
 [63]
 In selecting the Canadian portion of the Alcan Project the NEB explicitly stated:
 Assuming . . . that Alaska gas is to be connected to markets by a land bridge through Canada, it could be possible to prebuild some of the southern Canada and United States pipeline capacity to market gas which may be surplus to Canada's requirements in the late 1970's and early 1980's.
 NEB Decision, vol. 1, at I-161-162 (1977).
 
 
 [64]
 Overview accompanying President's Decision, at xii
 
 
 [65]
 June 7 Order, J.A. at 102 n. 8
 
 
 [66]
 15 U.S.C. § 717b (1976); See ANGTA § 9, 15 U.S.C. § 719g(a) (1976) (Federal officer or agency required to issue authorization for action necessary or related to the Alaska natural gas transportation system shall do so under provisions of law administered by such officer or agency)
 
 
 [67]
 42 U.S.C.A. §§ 7101-7352 (Supp.1977)
 
 
 [68]
 See 42 U.S.C.A. § 7252 (Supp.1977) (except as expressly prohibited by law, or otherwise provided in the DOE Act, Secretary may delegate any of his functions to such members of the Department of Energy as he chooses)
 
 
 [69]
 See Reply Brief of Michigan Wisconsin, at 14
 
 
 [70]
 DOE Delegation Order No. 0204-8, 42 Fed.Reg. 61491-92 (1977)
 
 
 [71]
 June 7 Order, J.A. at 103
 
 
 [72]
 15 U.S.C. § 717f (1976)
 
 
 [73]
 June 7 Order, J.A. at 103-04
 
 
 [74]
 Id. at 102, 105-06
 
 
 [75]
 August 4 Order, J.A. at 178
 
 
 [76]
 See Chicago & S. Air Lines, Inc. v. Waterman S. S. Corp., 333 U.S. 103, 112-13, 68 S.Ct. 431, 437, 92 L.Ed.2d 568 (1948) (administrative orders not reviewable unless they "impose an obligation, deny a right or fix some legal relationship"); Cf. Seaboard & W. Airlines, Inc. v. CAB, 86 U.S.App.D.C. 9, 11, 181 F.2d 777, 779 (1949) (if effect of order precludes petitioner from rights which it otherwise would have, order is final as to petitioner)
 
 
 [77]
 Continental Air Lines, Inc. v. CAB, 173 U.S.App.D.C. 1, 18, 522 F.2d 107, 124 (1974)
 
 
 [78]
 387 U.S. 136, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967)
 
 
 [79]
 Id. at 149, 87 S.Ct. at 1515
 
 
 [80]
 See Continental Air Lines, Inc. v. CAB, 173 U.S.App.D.C. 1, 19, 522 F.2d 107, 125 (1974) (if interests of those who seek review outweigh interests of court and agency in postponing review, question is ripe for review)
 
 
 [81]
 Our use of the term "finding" does not necessarily indicate that this is a final agency action within the meaning of the Administrative Procedure Act, 5 U.S.C. § 704 (1970)
 
 
 [82]
 Northwest-Pan-Alberta Contract § 2.8, March 9, 1978, Supra note 38
 
 
 [83]
 June 7 Order, J.A. at 104-06. The Commission assumes that the Canadian policy is to assure that Northwest's proposed imports, which are intended to support the ANGTS, are not made if the ANGTS is not to be realized. Id
 
 
 [84]
 See, e. g., Toilet Goods Ass'n v. Gardner, 387 U.S. 158, 163, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967); Abbott Laboratories v. Gardner, 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); Independent Bankers Ass'n v. Smith, 175 U.S.App.D.C. 184, 190, 534 F.2d 921, 927, Cert. denied, 429 U.S. 862, 97 S.Ct. 166, 50 L.Ed.2d 141 (1976); National Automatic Laundry & Cleaning Council v. Shultz, 143 U.S.App.D.C. 274, 280, 443 F.2d 689, 695 (1971)
 
 
 [85]
 Brief for FERC, at 52
 
 
 [86]
 See Continental Air Lines, Inc. v. CAB, 173 U.S.App.D.C. 1, 19, 522 F.2d 107, 125 (1974) (if agency position likely to be abandoned or modified before put into effect, court review interferes with process by which agency is attempting to reach final determination)
 
 
 [87]
 See Distrigas Corp. v. FPC, 162 U.S.App.D.C. 1, 9, 495 F.2d 1057, 1065 (1974) (section 3 expressly allows Commission to reexamine its decisions authorizing imports and to make supplemental orders if found necessary and appropriate)
 
 
 [88]
 See Application of Northwest Alaskan Pipeline Company for Conditional Order Authorizing the Importation of Natural Gas from the Dominion of Canada to Permit Early Construction of a Portion of the Eastern Leg of the Alaska Natural Gas Transportation System, Docket No. CP78-123 (Apr. 5, 1975), J.A. at 21 (information on names and locations of gas producing fields and most recent gas reserve estimates not currently available); 18 C.F.R. § 153.3(d) (1977)
 
 
 [89]
 ANGTA §§ 9(a), (b); 15 U.S.C. §§ 719g(a), (b) (1976)
 
 
 [90]
 June 7 Order, J.A. at 106
 
 
 [91]
 Id. at 102 (relying principally on President's Decision, Commission finds question of desirability of importing Alberta gas needs no relitigation)
 
 
 [92]
 Id. at 104 (emphasis added)
 
 
 [93]
 Northern Natural Gas Co. v. FPC, 130 U.S.App.D.C. 220, 225, 399 F.2d 953, 958 (1968); See City of Pittsburgh v. FPC, 99 U.S.App.D.C. 113, 126, 237 F.2d 741, 754 (1956) (citing McLean Trucking Co. v. United States, 321 U.S. 67, 79-80, 64 S.Ct. 370, 88 L.Ed. 544 (1944))
 
 
 [94]
 15 U.S.C. § 717f (1976)
 
 
 [95]
 June 7 Order, J.A. at 102. Northwest must file applications for authority to resell its imported gas, and to construct new facilities. 15 U.S.C. § 717f(c) (1976)
 
 
 [96]
 See Continental Air Lines, Inc. v. CAB, 173 U.S.App.D.C. 1, 19, 522 F.2d 107, 125 (1974) (if agency position likely to be modified before put into effect, review wastes court's time)
 
 
 [97]
 See Abbott Laboratories v. Gardner, 387 U.S. 136, 147, 154, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967) (issue's fitness for judicial decision involves determination whether 1) agency action is final, 2) issue presents purely legal question, and 3) immediate review will avoid multiplicity of suits); Cf. Toilet Goods Ass'n v. Gardner, 387 U.S. 158, 162, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967) (although agency action is final, issue not appropriate for judicial resolution)
 
 
 [98]
 See generally Toilet Goods Ass'n v. Gardner, 387 U.S. 158, 163-66, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967) (agency regulation final but issue not fit for judicial decision; court withholds consideration until regulation tested in concrete situation)
 
 
 [99]
 August 4 Order, J.A. at 178
 
 
 [100]
 June 7 Order, J.A. at 104-05
 
 
 [101]
 Ashbacker Radio Corp. v. FCC, 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108 (1945)
 
 
 [102]
 Id
 
 
 [103]
 Id. at 333, 66 S.Ct. at 151
 
 
 [104]
 See United Air Lines v. CAB, 97 U.S.App.D.C. 42, 44-45, 228 F.2d 13, 15-16 (1955) (petition for review of agency refusal to consolidate hearings dismissed because agency action not final; Ashbacker claims not ripe); Western Air Lines v. CAB, 184 F.2d 545, 551-52 (9th Cir. 1950) (Ashbacker claim not applicable to proceedings to consolidate hearings on allegedly competitive applications because agency action not final; petition for review dismissed)
 
 
 [105]
 Delta Air Lines v. CAB, 97 U.S.App.D.C. 46, 51, 228 F.2d 17, 22 (1955) (per curiam); Accord, Citizens Communications Center v. FCC, 145 U.S.App.D.C. 32, 36, 447 F.2d 1201, 1205 (1971); Midwestern Gas Transmission Co. v. FPC, 103 U.S.App.D.C. 360, 366, 258 F.2d 660, 666 (1958)
 
 
 [106]
 See Bethlehem Steel v. EPA, 536 F.2d 156, 162 (7th Cir. 1976) (possibility of future injury not sufficient to warrant review)
 
 
 [107]
 The Federal Power Commission indicated during Senate hearings on the ANGTA that estimates of future reserves in the MacKenzie Delta area vary so greatly that it would not be "prudent to attempt to quantify either the anticipated reserve addition rate or the deliverability therefrom." The Transportation of Alaskan Natural Gas: Joint Hearing on S.Res. 45 Before the Committees on Interior and Insular Affairs and Commerce of the Senate, 94th Cong., 2d Sess. 290-91 (1976) (Joint Senate Hearings) (written comments by FPC)
 
 
 [108]
 See NEB Decision, vol. 1, at 1-161-62, 2-180-81 (if southern portion of ANGTS were prebuilt and present surplus of Canadian gas shipped to United States now, such imports would have to be offset by reduction of exports later in 1980's, or replacement by Alaska gas)
 
 
 [109]
 Overview to President's Decision, at xii; See Report accompanying President's Decision, at 92-93 (predeliveries from Canada should stimulate further exploration in MacKenzie Delta region, and if exploration increased, possibility of obtaining additional amounts of Canadian gas in future will be enhanced)
 
 
 [110]
 See Joint Senate Hearings, at 617-18 (written comments by Department of State) (no formal coordination between Canadian and United States governments regarding selection of ANGTS; mandates of two countries' regulatory bodies to make determinations based on national interest mitigates against developing such coordination)
 
 
 [111]
 Abbott Laboratories v. Gardner, 387 U.S. 136, 148, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)
 
 
 [112]
 Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp., 333 U.S. 103, 112-13, 68 S.Ct. 431, 92 L.Ed.2d 568 (1948) (administrative orders not reviewable unless they impose obligation or deny right)
 
 
 [113]
 See Columbia Broadcasting Sys., Inc. v. United States, 316 U.S. 407, 418-19, 62 S.Ct. 1194, 86 L.Ed. 1563 (1942) (if expected conformity to order causes injury cognizable by court, order is reviewable)
 
 
 [114]
 See id. at 443-44, 62 S.Ct. 1194 (when agency action has immediate and practical impact on petitioner, held reviewable)
 
 
 [115]
 Abbott Laboratories v. Gardner, 387 U.S. 136, 152, 87 S.Ct. 1507, 1517, 18 L.Ed.2d 681 (1967) (petitioners must either comply with regulation at great expense, or follow status quo and risk prosecution); See Toilet Goods Ass'n v. Gardner, 387 U.S. 158, 164, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967) (challenged regulation does not affect petitioner's primary conduct; insufficient hardship to warrant review); Accord, Bethlehem Steel v. EPA, 536 F.2d 156, 163 (7th Cir. 1976)
 
 
 [116]
 June 7 Order, J.A. at 103
 
 
 [117]
 15 U.S.C. § 717f (1976)
 
 
 [118]
 See Distrigas Corp. v. FPC, 162 U.S.App.D.C. 1, 10, 495 F.2d 1057, 1066 (1974) (section 3 "public interest" standard essentially equivalent to section 7 standard of "public convenience and necessity"); Joint Senate Hearings, at 454 (FPC comments indicate that under sections 3 and 7 of Natural Gas Act, Commission considers gas supply in relation to demands for gas as shown by overall public interest)
 
 
 [119]
 This uncontroverted fact was presented at oral argument
 
 
 [120]
 Ashbacker Radio Corp. v. FCC, 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108 (1945)
 
 
 [121]
 Id. at 333, 66 S.Ct. 148
 
 
 [122]
 Delta Air Lines v. CAB, 97 U.S.App.D.C. 46, 51, 228 F.2d 17, 22 (1955) (per curiam)
 
 
 [123]
 Northwest Airlines v. CAB, 90 U.S.App.D.C. 158, 163, 194 F.2d 339, 344 (1952)
 
 
 [124]
 Ashbacker Radio Corp. v. FCC, 326 U.S. 327, 332, 66 S.Ct. 148, 90 L.Ed. 108 (1945)
 
 
 [125]
 See notes 107-10 and accompanying text Supra
 
 
 [126]
 See Brief for Midwestern, at 8-9, 12 (TransCanada, sole supplier for Midwestern's Northern Division, applied in April, 1978 to Canadian NEB for new license to export additional gas to Midwestern; Pan-Alberta will also apply for export license, and NEB "may well be reluctant to issue both licenses"); Application of Midwestern Gas Transmission Company for Clarification and/or Rehearing of FERC Order issued June 7, 1978, Docket Nos. CP78-123, Et al. (July 7, 1978), J.A. at 145
 
 
 [127]
 Citizens Communications Center v. FCC, 145 U.S.App.D.C. 32, 36, 447 F.2d 1201, 1204 (1971); Midwestern Gas Transmission Co. v. FPC, 103 U.S.App.D.C. 360, 366, 258 F.2d 660, 666 (1958); Delta Air Lines v. CAB, 97 U.S.App.D.C. 46, 51, 228 F.2d 17, 22 (1955) (per curiam)
 
 
 [128]
 June 7 Order, J.A. at 103-04 (conditional authorization makes no ruling on any matter except general public interest determination)
 
 
 [129]
 Brief for FERC, at 55-56
 
 
 [130]
 Cf. Bethlehem Steel v. EPA, 536 F.2d 156, 163 (7th Cir. 1976) (if challenged agency action is reviewable in future, hardship to parties not sufficient to warrant immediate judicial review)
 
 
 [131]
 See Municipal Intervenors Group v. FPC, 153 U.S.App.D.C. 373, 379, 473 F.2d 84, 90 (1972) (utilities subject to Natural Gas Act and Economic Stabilization Act of 1970; possibility of two types of review)
 
 
 [132]
 Id. (review only under Economic Stabilization Act)
 
 
 [133]
 15 U.S.C. § 719h(a) (1976)
 
 
 [134]
 Id. § 719g(a)
 
 
 [135]
 Id. § 717r
 
 
 [136]
 Id. § 719(a)(1) (emphasis added)
 
 
 [137]
 Id. § 719a
 
 
 [138]
 Id. § 719h(b)(2)
 
 
 [139]
 H.Rep. No. 1658, 94th Cong., 2d Sess. 31, Reprinted in (1976) U.S.Code Cong. & Admin.News, pp. 6643, 6657-58
 
 
 [140]
 We note that even if we had found the Commission's public interest determination ripe for review, we would not have been able to comply with the challengers' requests that we consider whether it is reasonable or supported by substantial evidence
 
 
 [141]
 See, e. g., United States v. SCRAP, 412 U.S. 669, 686-89 & n.14, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1972); Sierra Club v. Morton, 405 U.S. 727, 733, 92 S.Ct. 1361, 31 L.Ed. 636 (1972); Flast v. Cohen, 392 U.S. 83, 99-101, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968)
 
 
 [142]
 See Barlow v. Collins, 397 U.S. 159, 164-65, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970); Association of Data Processing Serv. Org's., Inc. v. Camp, 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). See also Simon v. Eastern Ky. Welfare Rights Org., 426 U.S. 26, 39 n.19, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976) ("zone of interests" test presents non-constitutional standing requirement)
 
 
 [143]
 ANGTA § 10(b)(2), 15 U.S.C. § 719h(b)(2) (1976)
 
 
 [144]
 Id. § 717b (1976)
 
 
 [145]
 Distrigas Corp. v. FPC, 162 U.S.App.D.C. 1, 10, 495 F.2d 1057, 1066 (1974)
 
 
 [146]
 Opp Cotton Mills v. Administrator, 312 U.S. 126, 152-53, 61 S.Ct. 524, 536, 85 L.Ed. 624 (1941) (emphasis added)
 
 
 [147]
 See notes 88-100 and accompanying text Supra
 
 
 [148]
 See note 88 and accompanying text Supra