730 F.2d 1566
 235 U.S.App.D.C. 136
 IOWA STATE COMMERCE COMMISSION, Petitioner
v.
OFFICE OF the FEDERAL INSPECTOR OF the ALASKA NATURAL GAS
TRANSPORTATION SYSTEM and United States of
America, Respondents,
Northern Border Pipeline Company, Intervenor.
 No. 83-2156.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 25, 1984.
Judgement Filed Feb. 1, 1984.
Opinion Filed April 6, 1984.
 
 Petition for Review of an Order of the Office of the Federal Inspector of the Alaska Natural Gas Transportation System.
 Diane L. McIntire, Washington, D.C., for petitioner.
 Rhodell G. Fields, Acting Gen. Counsel, Washington, D.C., Office of the Federal Inspector of the Alaska Natural Gas Transp. System, et al., for respondents.
 
 
 1
 Ronald Johnson, Washington, D.C., with whom Rush Moody, Jr. and William J. Grealis, Washington, D.C., were on the brief, for intervenor.
 
 
 2
 Before WALD and MIKVA, Circuit Judges, and VAN DUSEN,* Senior Circuit Judge for the United States Court of Appeals for the Third Circuit.
 
 
 3
 Opinion for the Court filed by Circuit Judge WALD.
 
 
 4
 Dissenting opinion filed by Circuit Judge MIKVA.
 
 WALD, Circuit Judge:
 
 5
 Petitioner, the Iowa State Commerce Commission (ISCC), seeks review of two final orders of the Office of the Federal Inspector (OFI) of the Alaska Natural Gas Transportation System (ANGTS) concerning inclusion of expenditures in the rate base of Northern Border Pipeline Co., the operator of the eastern leg of ANGTS. Specifically, ISCC challenges that part of OFI's final rate base determination which included profit realized by Northern Engineering International Co. (NEICO) as part of project management costs paid by Northern Border. ISCC also challenges the OFI denial of a rehearing on the same issue. As grounds for its challenges, ISCC alleges that (1) the OFI denied it an evidentiary hearing to which it was entitled under the Natural Gas Act, 15 U.S.C. Sec. 717c (1982), (2) the OFI decision was unsupported by substantial evidence, and (3) the OFI failed to enter findings and conclusions on all material issues of fact and law in contravention of the Administrative Procedures Act, 5 U.S.C. Sec. 557(c)(A) (1982).
 
 
 6
 Because we find that our review of the OFI orders is governed by section 10 of the Alaska Natural Gas Transportation Act (ANGTA), 15 U.S.C. Sec. 719h (1982), the scope of that review is severely limited: We may only consider whether the OFI orders denied ISCC's constitutional rights, or were "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 15 U.S.C. Sec. 719h(b)(2) (1982). Under this standard of review, we affirm the OFI's orders.
 
 I. BACKGROUND
 
 7
 This controversy is over an OFI determination of Northern Border's rate base for the eastern leg of the ANGTS.[1] This determination will later be used by FERC in deciding whether Northern Border's filed rate tariffs are "just and reasonable." 15 U.S.C. Sec. 717c (1982); see also, e.g., Northern Border Pipeline Co., Docket No. CP 78-124-008 (Dec. 30, 1983) (Order Accepting for Filing and Suspending Proposed Tariff Sheets, Subject to Refund and Conditions, and Granting Waiver). In setting the rate base OFI proceeded according to its "Statement of Policy on General Standards and Procedures for Rate Base Audit and Approval for the Alaska Natural Gas Transportation System." 46 Fed.Reg. 51726 (1981) [hereinafter cited as Policy Statement]. The Policy Statement says that "OFI will establish procedures [for rate base determinations] which comport with both the mandate for expedition (under section 9 of [ANGTA] ...) and also basic principles of procedural fairness (under the Natural Gas Act and other relevant authority)." 46 Fed.Reg. 51728 (1981) (footnotes omitted). The Policy Statement also explains that, since OFI exercises more direct planning and construction oversight as to ANGTA than FERC ordinarily does as to its licensees, OFI will therefore be familiar with the cost pipeline operators incur, and "most disputes [will] be resolvable on the basis of pleadings alone." Id. The Policy Statement goes on to provide a three-step proceeding for the rate base determination: (1) The Director of OFI's Audit and Cost Analysis will issue a tentative determination based on quarterly audit and management systems assessment reports, informal comments by the sponsor companies, and internal comments by the OFI staff; (2) the tentative decision will be publicly noticed, and all interested parties given an opportunity to comment on it. A protesting party will be required to (i) state clearly its position and specify any errors of material fact or law; (ii) file a brief supporting statement of its position; and (iii) provide sworn affidavits substantiating any counter-statements of material fact; (3) under ordinary circumstances, the Federal Inspector will render a final determination on this record. If the Federal Inspector finds that extenuating circumstances warrant additional information, he may call for further documentation, and even hearings on the record.
 
 
 8
 The Tentative Rate Base Determination regarding Northern Border Pipeline Company's costs during the period January 1, 1980, through March 31, 1982, was issued December 3, 1982. Letter from J. Richard Beuman, Director, Office of Audit and Cost Analysis, OFI, to John T. Rhett, Federal Inspector [hereinafter cited as Tentative Determination], Joint Appendix at 315-26 [hereinafter cited as J.A.]. It recommended inclusion in the rate base of all payments made to NEICO for project management services (including NEICO's profit). Tentative Determination, J.A. at 317-23. NEICO is a wholly-owned subsidiary of InterNorth, as is Northern Plains Natural Gas Company (Northern Plains), which owns 22.75% of Northern Border. In addition, Northern Plains is the managing partner of Northern Border, and its directorate is interlocking with those of both InterNorth and NEICO. Noting these facts, the Tentative Determination explained its conclusion that NEICO did not "control" Northern Border, and therefore that the "no profits to affiliates" rule of FERC, which usually prevents profits from being allowed for ratemaking purposes when services are rendered by companies in a control relationship with the applicant, did not apply in this case. It further explained that, under a market test the profits paid to NEICO were reasonable. Id. The ISCC filed comments disagreeing with the Tentative Determination's treatment of NEICO profits. These comments focused on the finding of "no control" and on the proper reading of precedent regarding the reasonableness of profits included in a rate base. Approximately six months later, the Federal Inspector issued his Final Determination affirming the Tentative Determination. Final Determination Approving in Part and Disallowing in Part Expenditures Claimed for Inclusion in Rate Base by Northern Border Pipeline Co. [hereinafter cited as Final Determination], J.A. at 356. The Final Determination responded to ISCC's comments by noting that ISCC had alleged no basic facts contrary to those considered in making the Tentative Determination. It concluded that the Tentative Determination had been correct in finding
 
 
 9
 that [Northern Border] and NEICO are not affiliated companies; that NEICO's profit should be judged on the basis of a market test; that the tests employed by the Director were adequate; and that payments under the contract ... should be considered reasonable.
 
 
 10
 J.A. at 361.
 
 
 11
 ISCC applied for a rehearing, claiming that the OFI's Final Determination was legally faulty because it failed to: (1) disclose the basis and reasons for its results in findings of fact and conclusions of law; (2) apply or distinguish existing precedent; (3) support its conclusion by substantial evidence; and (4) accord interested parties an opportunity to dispute material inferences of fact underlying the Determination. The Federal Inspector denied ISCC's application for rehearing. He found that "contentions 2 and 3 [were] totally untenable and warrant[ed] no further response." Denial of Rehearing, J.A. at 372. He also found that ISCC raised no genuine issue of material fact about the NEICO contract--that the only issue raised was purely "a question of law." Id. J.A. at 373. Finally, the Federal Inspector was satisfied that the Final Determination had taken "a hard look at the issue" raised by ISCC as required by this court in Greater Boston Television Corp. v. Federal Communications Commission, 444 F.2d 841 (D.C.Cir.1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971). Id. After denial of its request for a rehearing, the ISCC filed its petition for review in this Court.II. STANDARD OF REVIEW FOR RATE BASE DETERMINATIONS UNDER ANGTA
 
 
 12
 Before proceeding to the merits of ISCC's claims, we must determine the standard under which we will review the OFI Final Determination and Denial of Rehearing. In particular, if the rate base determination comes within agency action reviewable under section 10 of ANGTA, the scope of our review is severely restricted to issues of constitutionality, jurisdiction, and denial of statutory rights. See 15 U.S.C. Sec. 719h(b)(2) (1982).[2]
 
 
 13
 Two kinds of agency action are reviewable under section 10. First, section 10 "provides the exclusive avenue of judicial review for actions taken pursuant to section 9 of the Act." See 15 U.S.C. Sec. 719h(a) (1982). Section 9 actions include any "certificate, right-of-way, permit, lease or other authorization" that is required for "action which is necessary or related to the construction and initial operation of [ANGTS]." Second, enforcement of any "statutes ..., regulations ... [or] terms, conditions and stipulations of grants, certificates, permits, and other authorizations issued by Federal agencies with respect to pre-construction, construction and initial operation" of ANGTS "constitutes 'action' for purposes of Section 10." Sections 102, 201(a) of Reorganization Plan No. 1 of 1979, 44 Fed.Reg. 33663, 93 Stat. 1373 (1979) (establishing the OFI).[3] We turn now to see if the Northern Border rate base determination was either such an authorization or enforcement action.
 
 
 14
 We begin by looking at the basis of OFI's obligation to make a rate base determination. Ordinarily, a pipeline's rate base determination is scrutinized by FERC under the Natural Gas Act only as part of its review of filed rates.[4] See 15 U.S.C. Sec. 717c (1982); 18 C.F.R. Secs. 154.1-154.67 (1983). FERC's obligation (which it has transferred to the OFI) to make special, separate rate base determinations with respect to operators of ANGTS arises under President Carter's Decision on ANGTS,[5] which Congress explicitly adopted as part of ANGTA.[6] That Decision provides:
 
 
 15
 The applicant [for a FERC certificate] shall ... submit to [FERC] for approval on a timely basis all components of construction work in progress.
 
 
 16
 Decision, supra note 5, at 37. See 45 Fed.Reg. 85511 (1980) (interpreting this section of the Decision to mandate "approv[al] of rate base inclusions on a timely basis"). The Decision characterized this cost approval as a "term ... and condition ... appropriately incorporated into any certificate, right-of-way, lease, permit or authorization" to ensure "the proper management and the timely completion of the construction of [ANGTS]." Decision, supra note 5, at 26. In short, by approving President Carter's Decision, Congress mandated that periodic rate base inclusion determinations be made for pipeline companies holding FERC certificates of public convenience and necessity under ANGTA in order to facilitate cost control of ANGTS construction.[7]
 
 
 17
 The periodic rate base inclusion approvals are an intimate part of the Decision's framework for ANGTS, which calls for the pipeline to be privately financed. The Decision recognized that ANGTS would involve enormous outlays of capital. Decision, supra note 5, at 100 (report accompanying Decision) (ANGTS is "largest privately financed energy project ever undertaken"). Because "[t]he traditional tool for cost control in pipeline construction, [i.e. retrospective] regulatory oversight ... [through] cost disallow[ance]," was deemed insufficient to both assure cost control and minimize the uncertainty of investors about future revenues in these unique circumstances, Incentive Rate of Return for ANGTS, No. RM 78-12, 43 Fed.Reg. 45596 (1978) (FERC proposed rule), the Decision provided for timely approval of outlays on an ongoing basis for incorporation into the project's rate base. Decision, supra note 5, at 103 (report accompanying Decision).
 
 
 18
 Clearly, rate base determinations are thus part of the OFI's responsibilities to monitor cost control and to effectuate cost control incentives. As such, they are actions to enforce ANGTA, and FERC's regulations pursuant to ANGTA. In addition, since the President's Decision explicitly makes rate base approval a condition of pipeline operators' certificates of public convenience and necessity, rate base determinations are also actions to enforce this condition. Thus, according to section 202(a) of Reorganization Plan No. 1 of 1979, OFI's rate base determinations may be reviewed only under section 10 of ANGTA.
 
 
 19
 Even if the rate base determination were not a means of enforcement, it would be an "authorization" pursuant to section 9 of ANGTA. This court previously has broadly interpreted section 9's definition of an authorization that is required for "action which is necessary or related to the construction or initial operation of [ANGTS]." See Midwestern Gas Transmission Co. v. Federal Energy Regulatory Commission, 589 F.2d 603 (D.C.Cir.1978). In Midwestern Gas, we held that conditional authorization to import Canadian gas to be transported through a portion of ANGTS was covered by section 9 because "imports were a material element in the overall desirability of [ANGTS]." Id. at 616. Similarly, timely cost approvals, which facilitate the raising of capital, were a material element in the Decision's choice that ANGTS be privately funded, and hence in the overall desirability of the pipeline system. As we said in Midwestern Gas, "[t]he critical statutory language is 'necessary or related to' " construction or initial operation, id. at 614, and timely approval of construction costs falls within this language.
 
 
 20
 The dissent argues that the presumption in favor of judicial review precludes any inference, in the absence of explicit language, that Congress viewed rate base determinations as either an "authorization" or "enforcement," to be expedited under the special review provision of ANGTA. Diss.Op. at 1579, 1580, 1581. It thus disagrees with our interpretation that the President's Decision itself provides the explicit mandate by requiring that pipelines submit construction costs for approval in a timely manner.[8] Diss.Op. at 1581.
 
 
 21
 This submittal and approval requirement--we emphasize--is a vital part of the Decision's mechanism for facilitating the raising of capital for ANGTS by reducing the risks for ANGTS investors without shifting the risks of cost overruns to the consumer.[9] See Decision, supra note 5, at 100. We thus find the dissent's reading of the submittal and approval requirement to require only timely submissions but not expedited approval of these submissions to be senseless. There would be no rational purpose for such a half-a-loaf condition from anyone's point of view, investor or consumer. We believe that the dissent's position would undermine the envisioned security for investors' return by allowing the rate base, on which a reasonable return is permitted, to remain uncertain while FERC ratemaking proceedings and judicial review went on for years.
 
 
 22
 Nor does the dissent's foray into the legislative history convince us that Congress intended that rate base determinations be subject to full judicial review. The pre-Decision ANGTA simply did not speak to the application of section 9 to rate base determinations but the Decision, which has the force of statutory law, did--and it did so specifically, in our view.[10] In short, we believe that the Decision, which was explicitly approved by Congress after the enactment of ANGTA, envisioned that rate base determinations for ANGTS construction costs would be made on an expedited basis, and judicial review of such determinations would be limited.
 
 
 23
 III. PROCEDURAL REQUIREMENTS FOR SECTION 10 ACTIONS
 
 
 24
 Section 10 of ANGTA precludes us from substantively reviewing the Final Determination and Denial of Rehearing for reasonableness or substantial evidentiary support. See Earth Resources Co. v. Federal Energy Regulatory Commission, 617 F.2d 775, 777 (D.C.Cir.1980); H.R.Rep. No. 1658 Part 1, 94th Cong., 2d Sess. 31 (1976) U.S.Code Cong. & Admin.News 1976, p. 6643. We may only review claims that agency action is a "denial of constitutional rights," or "in excess of statutory ... authority, or limitations, or short of statutory right." 15 U.S.C. Sec. 719h(b)(2) (1982). ISCC expressly disavows that it is claiming a deprivation of constitutional rights, see Brief for Petitioner at 36 n. 1, and does not argue that rate base determinations are outside of OFI's authority. ISCC does contend, however, that OFI acted "short of statutory right" in denying it a hearing and failing to include explicit findings of fact and conclusions of law in the controversial Final Determination and Denial of Rehearing.[11]
 
 
 25
 ISCC bases its procedural claims on requirements mandated by the Natural Gas Act,[12] 15 U.S.C. Secs. 717-717z (1982), and the Administrative Procedure Act (APA), 5 U.S.C. Secs. 552-59, 701-06 (1982). Since these Acts govern rate base determinations made by FERC as part of its rate reviewing function and since ANGTA does not explicitly preempt these statutes,[13] ISCC contends that they govern OFI's rate base determinations as well.
 
 
 26
 To the extent that these procedural requirements are explicitly written into these statutes, ISCC is correct. See, e.g., Earth Resources, 617 F.2d at 779. But apart from the ever-present consideration that courts must be wary not to engraft onto statutes their own procedural panaceas for agency proceedings, see Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978), we must be especially cautious here because ANGTA explicitly and significantly limits judicial review in order to expedite OFI's authorizations under section 9. Hence, we should not require the OFI to follow those procedures that courts have read into the Natural Gas Act principally to facilitate substantive judicial review. With this concern in mind, we turn to ISCC's claims.
 
 A. Right to a Hearing
 
 27
 ISCC claims that the OFI procedures used in determining Northern Border's rate base denied its statutory right to an adjudicatory hearing under the Natural Gas Act, 15 U.S.C. Sec. 717d (1982). This court has previously held that, where a determination of just and reasonable rates is reviewable under a substantial evidence test, notice and comment procedures are statutorily insufficient and "some sort of adversary, adjudicative-type procedures [are] ... necessary." Mobil Oil Co. v. Federal Power Commission, 483 F.2d 1238, 1259 (D.C.Cir.1973). Under ANGTA, however, we cannot infer such a broad hearing requirement as an aid for our review, since ANGTA itself precludes review of the OFI's decision on either reasonableness or evidentiary grounds. See H.R.Rep. No. 1658 Part 1, 94th Cong., 2d Sess. 31 (1976) U.S.Code Cong. & Admin.News 1976, p. 6657 ("[i]t is not intended that the Court would have jurisdiction to look behind the agency decision to examine its reasonableness or determine whether it is adequately supported by the record of any proceedings as may have occurred before the agency"). We thus conclude that hearing requirements beyond "notice and comment" are not required by the Natural Gas Act or the APA for section 10 pipeline rate base determinations. We recognize that this holding leaves the OFI wide discretion in its rate base determinations; nonetheless, this is what Congress apparently wanted. It still requires, however, that the Federal Inspector carefully consider submitted comments. Even where, as here, the agency's discretion is great, "if [the] agency simply ignores issues whose relevance to the public interest is obvious, the agency's decision may be reversed." General Motors Corp. v. Federal Energy Regulatory Commission, 613 F.2d 939, 944 (D.C.Cir.1979) (quoting Union Mechling Corp. v. United States, 566 F.2d 722, 724 (D.C.Cir.1977)). We must satisfy ourselves at least that ISCC had a meaningful opportunity to comment and that the OFI actually dealt with the comments presented to it. Id.
 
 
 28
 ISCC raises three particular issues on which it believes no adequate hearing was provided. It contends first that NEICO controls Northern Border so that FERC's normal "no profits to affiliates" rule should apply, second that the profits allowed by the NEICO contract were not reasonable in their own right, and third that the NEICO contract was unnecessary since it duplicated another contract Northern Border had with Northern Plains. Under the limited scope of ANGTA hearing requirements we find ISCC was not denied its hearing rights.
 
 
 29
 NEICO control of Northern Border. The Tentative Determination, which essentially plays the role of notice under OFI's procedures, explicitly addressed the affiliation of NEICO and Northern Border. It clearly stated the evidence upon which it relied, and found that "a 'control' situation does not exist." Tentative Determination, J.A. at 318. Based on this finding, the Tentative Determination decided to apply a market test rather than a strict "no profits to affiliates" rule. In doing so, it claimed to follow Florida Gas Transmission Co. v. Federal Power Commission, 362 F.2d 331 (5th Cir.1966), modified on other grounds, 391 F.2d 114 (5th Cir.1968), which it read to preclude application of that rule unless the affiliates were so close that they constituted, in effect, a single entity. ISCC commented extensively on this finding and the application of Florida Gas Transmission. See Letter from Diane L. McIntire, Counsel for ISCC, to John T. Rhett, Federal Inspector (Mar. 11, 1983) [hereinafter cited as ISCC Comments], J.A. 341-345. In his Final Determination, the Federal Inspector explicitly addressed ISCC's comments on control. Final Determination, J.A. at 362. He noted that the evidence upon which ISCC relied to question the Tentative Determination was precisely that which the Tentative Determination had considered. Id. Finally, he agreed with the Tentative Determination that Florida Gas Transmission applied to this case and that it allowed reasonable profits paid to NEICO to be included in Northern Border's rate base. Thus, ISCC certainly got a "hearing" that satisfied the notice and comment requirements of 5 U.S.C. Sec. 553 (1982). Its remaining discontent must be attributed to the reasonableness of the Federal Inspector's decision on control, which, for good or for ill, Congress has decided we cannot review.
 
 
 30
 Reasonableness of the NEICO contract. ISCC's claim that OFI denied it a hearing on the reasonableness of the NEICO contract is equally unfounded. Essentially it took issue with the OFI's decision that a market test could be used to determine the reasonableness of the terms and profits in a project management contract to be performed during Northern Border's construction phase. See Tentative Decision, J.A. at 318 (market test "raises difficult issues" but is applicable). ISCC did in fact argue this point of view at length in its comments. The Federal Inspector rejected ISCC's arguments and held that "[c]ontracts for services of a similar nature on the Alaskan Leg of ANGTS and a previous contract on the Eastern Leg provided a reasonable 'market' basis for evaluating the basic compensation terms." Final Determination, J.A. at 360. He went on to find that under this test "the payments to NEICO (and the terms of the NEICO contract ...) were ... reasonable." Id. ISCC is statutorily entitled to no more.
 
 
 31
 The need for the NEICO contract. On appeal, ISCC also contends that it had a right to a hearing on the issue of whether Northern Plains was already obligated to provide, without profit, the services for which NEICO was paid a profit under the project management contract. Certainly, if its allegations were true then exclusion of NEICO's profit from Northern Border's rate base would have been appropriate, since such profit would be an unnecessary cost for Northern Border. Thus, such allegations would raise a material issue of fact, in which case the OFI's procedures acknowledged that a fuller hearing might be appropriate. In its Final Determination, moreover, the OFI never referred to or commented on this factual contention, thus apparently denying to ISCC even its statutory due of consideration by the decisionmaker.[14] J.A. at 372-74. At first blush, this would seem to contravene ISCC's right to any kind of hearing under the Natural Gas Act.
 
 
 32
 A closer look at the record, however, persuades us that ISCC never identified this specific issue with sufficient particularity to fairly apprise the Federal Inspector that it was a contested fact. In its original submission to the OFI, the allegation that the NEICO contract was duplicative appeared as a single sentence effectively buried in several pages of ISCC's general comments on the issue of control and the applicability of a market test to determine reasonable profits. See ISCC Comments, J.A. at 343. This one sentence gave no indication that ISCC meant to raise an entirely distinct factual issue about the duplication. ISCC thus failed to set out this allegation in a clear statement of issues of disputed fact supported by affidavits as OFI's Policy Statement requires. See 46 Fed.Reg. 51726 (1981). Even in its petition for rehearing, ISCC never isolated this contested issue of fact from its general control and profits arguments. See Rate Base Determination--Northern Border Pipeline Co., ISCC Application for Rehearing (filed September 22, 1983), J.A. at 365-70. In light of OFI's mandate to expedite rate base determinations, ISCC could not reasonably expect the OFI to entertain a "rehearing" on an issue that was not clearly highlighted in the first place. Thus, ISCC cannot now contend that the OFI acted improperly in not providing an evidentiary hearing or addressing an issue it failed to properly identify as substantial or contested. On all these points, we find ISCC received the only "hearing" rights Congress, and by delegation the OFI, provided it under ANGTA.
 
 B. Ex Parte Contacts and Discovery
 
 33
 ISCC contends that even if it is entitled to a mere paper hearing complying only with notice and comment procedures, such a hearing still must comply with standards of basic fairness, i.e., ISCC must be able to identify and challenge the evidence on which the decision is being made. Brief for Petitioner at 26. ISCC claims that the OFI's reliance on ex parte contacts and its refusal to afford ISCC any discovery prevented ISCC from "developing a record" to contest the bases of the OFI's rulings. Id. at 29.
 
 
 34
 ISCC says first that the OFI depended in part on reports from pipeline operators to the OFI Director of Audit and Cost Analysis--reports ISCC labels ex parte communications--to reach its Tentative Determination. ISCC thus considers the OFI process here to be fatally flawed in the same way as the ex parte contacts and secret decisionmaking in Home Box Office, Inc. v. FCC, 567 F.2d 9, 54-57 (D.C.Cir.1977), cert. denied, 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977).
 
 
 35
 We note at the outset that this court has not interpreted Home Box Office to apply to all informal rulemaking proceedings. See Sierra Club v. Costle, 657 F.2d 298, 401-02 (D.C.Cir.1981) (Home Box Office not applicable to informal rulemaking of "general policy-making sort"); see also United Steelworkers of America v. Marshall, 647 F.2d 1189, 1218 (D.C.Cir.1980) (suggesting same), cert. denied, 453 U.S. 913, 101 S.Ct. 3149, 69 L.Ed.2d 997 (1981). One certainly may argue plausibly, based on prior statements of this court, that ratemaking is a special type of "rulemaking" to which Home Box Office should apply. See, e.g., National Small Shipments Traffic Conference v. Interstate Commerce Commission, 590 F.2d 345, 350-51 (D.C.Cir.1978) ("adjudication contemplated in this [particular ratemaking] case lies near the core described by the [ex parte communications] rationale") (dicta). But even if we accept this proposition, ISCC's attack on the disputed contacts here fails. Home Box Office recognized that "informal contacts between agencies and the public are the 'bread and butter' of the process of administration," and barred ex parte contacts only after the publication of the notice of proposed rulemaking. Id. at 57. In this case, OFI explicitly used required reports and audits from the pipeline companies only to enable OFI's Director of Audit and Cost Analysis to issue a tentative decision--a rough equivalent of the notice of proposed rulemaking. Once that decision was issued no further ex parte contacts were allowed. Furthermore, at oral argument, counsel for the OFI stated, and ISCC did not appear to contest, that the information on which the Tentative Determination was based was available to the public upon request. The Final Determination made by the Federal Inspector was thus based on the publicly available information which led to the Tentative Determination, and on subsequent public comments. This process, while departing somewhat from usual ratemaking proceedings, is a far cry from the "secret decision-making" that Home Box Office condemned. The contacts about which ISCC complains occurred only before the Tentative Determination was published; their contents were apparently open to public scrutiny, therefore OFI hearing procedures did not violate basic tenets of fairness derived from the applicable statutes or our prior holdings.
 
 
 36
 ISCC also takes issue with OFI's procedures on the grounds they provide no opportunity for discovery, thereby rendering ISCC impotent to develop support for its factual contentions, and effectively emasculating its right to intervene. This lack of discovery, according to ISCC, along with the OFI reliance on pipeline operator reports to reach a tentative determination, led to a lopsided record. ISCC asserts that "[s]uch a state of affairs was clearly not intended by Congress when it passed the Natural Gas Act (or even ... ANGTA)." Brief for Petitioner at 30.
 
 
 37
 Many of ISCC's criticisms of the process are well taken--in the context of ordinary judicial review of administrative action. But under ANGTA, the reviewing court can monitor the decisionmaking process only to assure there has been no abrogation of a specific constitutional or statutory right. Congress, by approving expedited rate base determinations and limiting judicial review so drastically, has purposefully invested the OFI with very broad latitude to assess what evidence it needs to make rate base determinations, and what procedures will efficiently allow it to collect that evidence. Unless these procedures violate the most fundamental notions of fairness or a specific statutory guarantee, we have no authority to interfere.[15] In the case of denial of discovery rights, we find no such explicit violation of a statutorily guaranteed right. Discovery can add months or even years to proceedings, and Congress apparently desired these proceedings to be expedited at the expense of more traditional guarantees of full and fair hearings. We therefore reject ISCC's suggestion that we read into ANGTA a requirement that parties be allowed discovery in section 10 expedited proceedings.
 
 C. Findings of Fact and Conclusions of Law
 
 38
 ISCC's final procedural attack focuses on the cursory nature of the Final Determination's findings of fact and conclusions of law. It first contends that the failure of the Federal Inspector to include explicit findings and conclusions violates the APA, 5 U.S.C. Sec. 557(c)(3). Brief for Petitioner at 39-40. The section of the APA that ISCC cites, however, applies only to "on the record" adjudications and rulemakings, see United States v. Florida East Coast Realty Co., 410 U.S. 224, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973), and not to ratemaking under the Natural Gas Act. See Mobil Oil, 483 F.2d at 1251. Still, the ISCC argues that an adequate statement of findings and conclusions is required as the basis of any agency decision. Brief for Petitioner at 40. The traditional rationale for such a requirement has been its necessity as a basis for substantive judicial review:
 
 
 39
 [T]here must be sufficient indication in the agency decision of the basis for the Commission's action, so that the court may ascertain whether the agency was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, as outlined by 5 U.S.C. Sec. 706 (1976).
 
 
 40
 Estate of French v. Federal Energy Regulatory Commission, 603 F.2d 1158, 1162 (5th Cir.1979). That consideration is not applicable here.
 
 
 41
 Nevertheless, we believe that the OFI does have an obligation to state sufficient findings and reasons supporting its decision to permit the limited judicial review authorized here, i.e., to ensure that the OFI contravened no statutory rights. As Judge Augustus Hand said many years ago:
 
 
 42
 "The basic findings essential to the validity of a given order will vary with the statutory authority invoked and the context of the situation presented." ... [But i]t is ... necessary that the essential basis of the Commission's order appear in the report so that a court can satisfy itself that the Commission has performed its function.
 
 
 43
 Luckenbach S.S. Co. v. United States, 122 F.Supp. 824, 828 (S.D.N.Y.) (quoting Alabama Great Southern Railroad Co. v. United States, 340 U.S. 216, 71 S.Ct. 264, 95 L.Ed. 225 (1951)), aff'd, 347 U.S. 984, 74 S.Ct. 850, 98 L.Ed. 1120 (1954).
 
 
 44
 In addition, a statement of findings and reasons "has a rationale of its own, quite separate from facilitating judicial review on the merits.... [A] 'reasons' requirement promotes thought by the decision-maker and 'compels him to cover the relevant points and eschew irrelevances.' " Exxon Pipeline Co. v. United States, 725 F.2d 1467 at 1473 (1984) (quoting Dunlop v. Bachowski, 421 U.S. 560, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975)) (holding that in light of reasons requirement, court's review should assure that reasons are relevant to statutorily prescribed inquiries). A "reasons" requirement also permits a pipeline to fathom what costs it may include in its rate base, and thereby to avoid future problems due to unrecovered costs and resulting difficulties in obtaining capital for further construction and operation. Cf. id. (statement of reasons allow pipeline to plan for delays in filed rates taking effect). Finally, a statement of findings and reasons helps maintain public accountability. Even if the courts cannot review the OFI's decision for rationality, the public should be able to do so. A statement of facts found and reasons for agency action is included in the minimal criteria of administrative due process, and we have no evidence that Congress meant to push expedition to the extreme of eliminating even this most fundamental protection against official abuse.
 
 
 45
 Although we cannot assure that the Final Determination meets traditional notions of logic or evidentiary support, we should require on review that the OFI, in a final rate base determination, address all significant issues of fact and policy that are raised by comments and are obviously pertinent to the decision. This requirement (1) guarantees that the parties submitting comments will get their statutorily prescribed hearing,[16] (2) encourages the OFI to think about all pertinent issues, (3) gives the pipelines some direction regarding future costs, and (4) ensures the opportunity of public review for reasoned and consistent decisionmaking.
 
 
 46
 In this case we find that the Final Determination did address all pertinent issues raised by ISCC, and therefore comports with the requirement of essential findings and conclusions. The Final Determination found: (1) NEICO did not control Northern Border, (2) a market test can ascertain the reasonableness of a contract for management service provided to a pipeline operator constructing a section of ANGTS, and (3) the rates charged in the NEICO contract were reasonable. It included the following legal conclusions: (1) the "no profits to affiliates rule" is inappropriate in this case, and (2) the market test for reasonableness is appropriate under Florida Gas Transmission, 362 F.2d 331. We find that these findings and conclusions address all contentions explicitly raised in ISCC's comments, and that therefore the Final Determination is not faulty for lack of findings of fact and conclusions of law.
 
 IV. CONCLUSION
 
 47
 In sum, we hold that rate base determinations for costs incurred by the operator of a segment of ANGTS, prior to the in-service date of that segment are reviewable only under section 10 of ANGTA. Under that section's circumscribed standard of review, the OFI did not deny ISCC any right to which it was statutorily entitled. For these reasons, the decision of the Federal Inspector is
 
 
 48
 Affirmed.
 
 MIKVA, Circuit Judge, dissenting:
 I.
 
 49
 The outcome of this case turns entirely on a difficult question of statutory construction. If, as the majority concludes, section 10 of the Alaska Natural Gas Transportation Act (ANGTA), 15 U.S.C. Sec. 719h (1982), governs our review of the rate base determinations at issue in this case, we are precluded from reviewing the Federal Inspector's (OFI) determinations for reasonableness or for substantial support on the record. See Earth Resources Co. v. Federal Energy Regulatory Commission, 617 F.2d 775, 777 (D.C.Cir.1980). Under such circumstances, the result reached by the majority is clearly appropriate. If, on the other hand, section 10 of ANGTA is inapplicable, and OFI rate base determinations may be scrutinized under a substantial evidence standard, see 15 U.S.C. Sec. 717r(b) (1982), it is clear that the procedures afforded petitioner in this case cannot withstand review. See Mobil Oil Co. v. Federal Power Commission, 483 F.2d 1238, 1259 (D.C.Cir.1973). The majority concedes as much. See Majority Opinion at 1574, 1577. Because I find the majority's analysis with respect to the statute's applicability strained, I respectfully dissent.
 
 
 50
 Agency rate determinations have traditionally been subject to judicial review. I cannot agree with my colleagues that in section 10 of ANGTA, Congress sub silentio deviated from this common practice. The majority's decision today has dramatic implications for consumers of natural gas. Under the majority's reasoning, OFI rate base determinations on all segments of the Alaska Natural Gas Transportation System (ANGTS)--determinations that will affect the rates paid by consumers throughout the lifetime of the Alaskan pipeline--are insulated from all but the most perfunctory review. In reviewing costs for inclusion in a rate base, agencies with rate-setting authority are directed to approve only such costs as will result in a "just and reasonable" rate. See 15 U.S.C. Sec. 717c(a) (1982). To prohibit judicial review of the reasonableness of such decisions, as the majority does in this case, is tantamount to eliminating any review. Such a result is not favored in the law. The Supreme Court in Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), held that "only upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review." Id. at 141, 87 S.Ct. at 1511 (citation omitted). See also Harper v. Levi, 520 F.2d 53, 67 (D.C.Cir.1975). Paradoxically, the majority is willing to impute such an intent to Congress in this case on the slimmest of evidence; I am not.
 
 
 51
 It is beyond peradventure that Congress wanted a "hurry-up" procedure to govern the regulatory aspects of the construction of ANGTS. Section 10 of ANGTA and its legislative history make it clear that Congress did not want the courts to be used to slow down the pipeline's construction; it wanted the pipeline built "full speed ahead." Congress did not, however, throw out the baby, the bath water, and the bathtub of natural gas rate regulation. It did not intend that natural gas be exempt from normal ratemaking and review processes merely because it happened to flow through ANGTS' pipelines. This is my point of tension with the majority's analysis of section 10.
 
 II.
 
 52
 The majority correctly notes that section 10 of ANGTA applies to two kinds of agency action: (1) actions taken pursuant to section 9 of the Act, and (2) enforcement decisions of the Federal Inspector made pursuant to section 202(a) of Reorganization Plan No. 1 of 1979, 44 Fed.Reg. 33,663, 93 Stat. 1373 (1979) (reprinted in 15 U.S.C. Sec. 719e (1982)). Majority Opinion at 1570. The majority concludes that OFI rate base determinations qualify as agency action under both of these provisions. Consonant with the majority opinion, I will examine these provisions in inverse order.
 
 
 53
 A. Enforcement Activities Under the Reorganization Plan
 
 
 54
 Pursuant to the Reorganization Plan, President Carter, with the approval of Congress, created the Office of the Federal Inspector and transferred to it "exclusive responsibility" for the enforcement of "Federal statutes ..., regulations and ... terms, conditions, and stipulations of grants, certificates, permits and other authorizations issued by Federal agencies with respect to pre-construction, construction, and initial operation" of ANGTS. Reorganization Plan, supra, Sec. 102. The majority concludes that the ratemaking functions performed by OFI in this case qualify as "enforcement activities" under the Reorganization Plan. This conclusion unduly stretches the plain meaning of the word "enforcement."
 
 
 55
 The importance of the designation of an OFI action as an "enforcement activity" is demonstrated by section 202 of the Plan. Under section 202(a), OFI decisions on "enforcement matters" are explicitly characterized as " 'action' for purposes of Section 10" of ANGTA. Section 202(b), in contrast, makes OFI "responsible for coordinating the expeditious discharge of nonenforcement activities by Federal agencies" and authorizes, "[u]pon agreement between the Federal Inspector and the head of any agency," the delegation "to the Federal Inspector [of] any statutory function vested in such agency related to the functions of the Federal Inspector." Id. Sec. 202(b). OFI actions taken pursuant to section 202(b) are not characterized as "action" for purposes of section 10. Importantly, despite conflicting interpretations by OFI, the ratemaking authority exercised by OFI in this case was delegated to it from FERC under section 202(b)--a section applicable only to nonenforcement functions. See 45 Fed.Reg. 8511-12 (1980).
 
 
 56
 In concluding that rate base determinations qualify as enforcement activities under the Reorganization Plan, the majority relies entirely upon a decision and report issued by President Carter in 1977, two years before the issuance of the plan itself. See Executive Office of the President, Energy Policy and Planning, Decision and Report to Congress on the Alaska Natural Gas Transportation System (1977) (hereinafter cited as Decision). The majority reasons that, since the President's Decision makes the timely submittal of construction costs for approval a "term or condition" of the applicant's certificate of public convenience and necessity, any action taken by FERC, or its delegatee, to approve or disapprove those costs is an action to "enforce" that submittal requirement. Majority Opinion at 1570, 1571. Based on this assumption, the majority concludes that "since the President's Decision explicitly makes rate base approval a condition of pipeline operators' certificates of public convenience and necessity, rate base determinations are also actions to enforce this condition." Id. at 1571. The assumption and the conclusion are equally unfounded.
 
 
 57
 The President's Decision does not, explicitly or otherwise, make rate base approval a condition of the pipeline operator's certificate; it merely requires operators to submit their costs in a timely fashion. When the regulatory authority acts to approve or disapprove the submitted cost it is not "enforcing" the submittal requirement within any common understanding of the meaning of the word; rather, it is making a determination as to the reasonableness of the submitted item. That the President's Decision does not support such a strained definition of the word "enforcement" is evidenced by its description of the transfer of authority contemplated in the subsequent Reorganization Plan:
 
 
 58
 This plan will propose a limited, single-purpose transfer of field-level supervisory authority over enforcement of terms and conditions for the duration of the preconstruction and construction phases of the Alcan project. No other transfer of existing authority, or transfer of any coordination function, will be proposed in the reorganization plan.
 
 
 59
 Decision at 204. See also id. at 198-99. Rate base determinations hardly qualify as "field-level supervisory" functions. Neither the President's Decision, nor the Reorganization Plan, support the majority's interpretation. Ratemaking is not an enforcement activity within the meaning of the Reorganization Plan.
 
 B. Section 9 Actions
 
 60
 Independent of the enforcement function analysis criticized above, the majority concludes that the rate base determinations at issue in this case are subject to review only under the terms prescribed in section 10 of ANGTA because the determinations qualify as actions taken pursuant to section 9. Majority Opinion at 1571. I find my colleagues' reasoning here equally unpersuasive. Section 9 provides that:
 
 
 61
 To the extent that the taking of any action which is necessary or related to the construction and initial operation of the approved transportation system requires a certificate, right-of-way, permit, lease, or other authorization to be issued or granted by a Federal officer or agency, such Federal officer or agency shall ... issue or grant such certificates, permits, rights-of-way, leases, and other authorizations at the earliest practicable date.
 
 
 62
 15 U.S.C. Sec. 719g(a) (1982). Thus, in order for the action of a federal officer or agency to qualify as an action "taken pursuant to [section 9]," 15 U.S.C. Sec. 719h(a), that action must involve (1) the issuance or granting of a certificate, right-of-way, permit, lease, or other authorization that is (2) required by the operator of the approved transportation system in order to (3) take an action which is necessary or related to the construction or initial operation of that approved system. Each aspect of this definition must be satisfied in order to invoke the limited review provisions of section 10. I conclude that OFI rate base determinations do not satisfy this three-part definition.
 
 
 63
 The majority argues that OFI rate base determinations fit within the "or other authorization" language of section 9--finding support for its broad interpretation of the word "authorization" in this court's decision in Midwestern Gas Transmission Co. v. Federal Energy Regulatory Commission, 589 F.2d 603 (D.C.Cir.1978). Majority Opinion at 1571. That reliance is misplaced. Midwestern Gas involved challenges to FERC orders granting import applications permitting the importation of natural gas from Canada through the prebuilt portion of ANGTS. It was uncontested that the sought after import permits qualified as certificates, rights-of-way, permits, leases, or other authorizations within the meaning of section 9; the only dispute was whether the importation of Canadian gas was "necessary or related to the construction and initial operation of" ANGTS. 589 F.2d at 614. The court ruled that it was. Midwestern Gas is precedent for the adoption of a broad interpretation of what is "necessary or related to the construction and initial operation" of ANGTS; however, it provides no support for the strained interpretation of "authorization" adopted by the majority. Although one may concede that the obtaining of a permit for the importation of Canadian gas through ANGTS is a requirement for the taking of an action necessary or related to the construction and initial operation of the pipeline, it does not follow that the setting of a rate base which will affect the pricing of that imported gas is also a required "authorization."
 
 
 64
 I find it beyond comprehension that Congress intended to include OFI rate base determinations within section 10's limited judicial review provisions. Agency ratemaking decisions are frequent subjects of judicial review. In delegating ratemaking functions to administrative agencies, Congress has traditionally provided for judicial review of the reasonableness of rate decisions. See, e.g., 15 U.S.C. Secs. 717c & 717r (1982); 16 U.S.C. Secs. 824d & 825l (1982); 49 U.S.C. Sec. 15 (1976). If Congress had intended to deviate from this common practice in ANGTA, I submit, it would have done so explicitly. No such intent is evident. Ratemaking, even if arguably an authorization, is not of the same kind as certificates, rights-of-way, permits, and leases. In section 9, Congress demonstrated its ability to list specifically the agency actions it intended to expedite and subject to truncated judicial review. That it omitted ratemaking activities, the most obvious component of pipeline regulation, is not without significance. The congressional reports issued in reference to ANGTA indicate that the delays Congress sought to avoid through ANGTA's expedited procedures were construction-related, not rate-related. See S.Rep. No. 94-1020, at 7 (1976); H.R.Rep. No. 94-1658, at 23 (1976). There is simply no basis for the majority's conclusion that Congress intended ratemaking functions, the largest and most obvious component of pipeline regulation, to be included within the generic category of "other authorizations."
 
 
 65
 In fact, the available legislative history is at odds with the majority's interpretation. The legislative history evidences a recognition on the part of Congress of the seriousness of limiting judicial review and a concern that ANGTA's limitations be narrowly construed. For example, Senator Jackson stated:
 
 
 66
 The limitations on judicial review deserve special attention. Under section 10 of S. 3521 as reported, the actions of Federal officers and agencies in issuing necessary authorizations and approvals pursuant to the act may be judicially reviewed only under certain conditions and under certain time limitations....
 
 
 67
 These limitations are intended to be narrowly construed. Moreover, section 9(b) [9(c) ] makes it clear that the existing body of law pursuant to which any authorization is issued must be complied with. This is a procedural bill which, unless otherwise explicitly stated therein, does not modify existing rights and obligations of affected persons. The provisions of the Natural Gas Act apply, for example, to the extent they are not inconsistent with the act.
 
 
 68
 122 Cong.Rec. 22,023 (1976). The Senate Report on an earlier version of ANGTA evidences Congress' intent on the precise issue before this court. It notes that:
 
 
 69
 the provisions of the Natural Gas Act are to apply to the extent that they are not inconsistent, as determined by the Commission, with this Act. Thus, for example, Commission regulation of the rates and charges for natural gas transportation through the Alaska natural gas transportation system will be subject to the Natural Gas Act just as any other natural gas company would be subject to the Natural Gas Act.
 
 
 70
 S.Rep. No. 94-1020, at 14 (1976) (emphasis added). Although the quoted language refers to a specific section of the Senate-reported bill that was not included in the version ultimately adopted, there is nothing in the subsequent legislative history of ANGTA, or in ANGTA itself, to suggest that the cited example is not equally applicable to the enacted version. In fact, the Senate floor manager of ANGTA, Senator Stevenson, in urging adoption of the House amendments to the bill, enumerated his concerns regarding the substantive changes made in the Senate bill by the House amendments. None of these concerns involved ANGTA's judicial review provision. See 122 Cong.Rec. 34,57 4 (1976) (statement of Senator Stevenson).
 
 
 71
 The majority dismisses this clear evidence of congressional intent as irrelevant because it occurred prior to the issuance of the President's Decision. Blind to the explicit references in the legislative history concerning the appropriate scope of section 10's judicial review provisions, the majority asserts that "[t]he pre-Decision ANGTA simply did not speak to the application of section 9 to rate base determinations." Majority Opinion at 1572. The majority chooses, instead, to rely on President Carter's 1977 Decision. The majority opinion does not, however, articulate any line of reasoning, other than that criticized above, or cite to any portion of the Decision which identifies rate base approval as an "authorization" "necessary or related to the construction and initial operation" of ANGTS. As noted above, the President's Decision did not make rate base approval a condition on the construction or initial operation of the pipeline. Any conclusion to the contrary is belied by the fact that intervenor Northern Border had been operating the pipeline, under a valid FERC certificate issued in April 1980, for several months prior to the issuance of the rate base determinations involved in this case. See Northwest Alaskan Pipeline Co., 11 FERC (CCH) p 61,088 (April 28, 1980).
 
 III.
 
 72
 Without any evidence of congressional intent, today's majority takes a position which eviscerates any meaningful review of agency rate base determinations--determinations which, as noted above, will have dramatic and long-term effects on the rates paid by consumers of natural gas, and which traditionally have been subject to plenary judicial review. An agency directed by statute to set "just and reasonable" rates is insulated from any judicial review as to the justness and reasonableness of its determinations. In addition, what little review the court is entitled to conduct, must be performed, and a final decision entered, within 90 days. 15 U.S.C. Sec. 719h(c)(2) (1982). Consumers may take little solace in the majority's statement that this non-review will be of limited duration, that "[a]fter the Federal Inspector approves a rate base for a segment of ANGTS," subsequent review of rates filed for that segment will be conducted by FERC "under the usual procedures provided by the Natural Gas Act." Majority Opinion at 1570-1571 n. 7. These future rates will be based on a rate base arrived at under defective procedures. The rate base will never again be subject to agency or judicial review.
 
 
 73
 The majority apparently recognizes that its decision today authorizes procedures which are anathema to the normal procedures required for ratemaking. See, e.g., id. at 1574 ("We recognize that this holding leaves the OFI wide discretion in its rate base determinations; nonetheless, this is what Congress apparently wanted"), 1575 ("[Petitioner's] remaining discontent must be attributed to the reasonableness of the Federal Inspector's decision on control, which, for good or ill, Congress has decided we cannot review"), 1577 ("Congress apparently desired these proceedings to be expedited at the expense of more traditional guarantees of full and fair hearings"). I do not believe that Congress deserves the culpability for this aberrational result. Rate base determinations are neither "decision[s] on enforcement matters" under the Reorganization Plan, nor "authorization[s] ... issued or granted by a Federal officer or agency" which are necessary or related to the construction and initial operation of ANGTS. For the reasons set forth above, I would vacate the challenged orders of the Federal Inspector and would remand this matter to the OFI for further proceedings consistent with the procedures required under the Natural Gas Act. See Mobil Oil Co. v. Federal Power Commission, 483 F.2d 1238 (D.C.Cir.1973).
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. Sec. 294(d)
 
 
 [1]
 The Federal Energy Regulatory Commission (FERC) delegated its responsibility to set Northern Border's rate base to OFI pursuant to Sec. 202(b) of the President's Reorganization Plan No. 1 of 1979, 44 Fed.Reg. 33663, 93 Stat. 1373 (1979) [hereinafter cited as Reorganization Plan]. See 45 Fed.Reg. 85511 (1980)
 
 
 [2]
 Section 10 provides:
 (a) Notwithstanding any other provision of law, the actions of Federal officers and agencies taken pursuant to section 719g of this title [section 9 of the Act], shall not be subject to judicial review except as provided in this section.
 ....
 (b)(2) Claims alleging that an action will deny rights under the Constitution of the United States, or that an action is in excess of statutory jurisdiction, authority, or limitations, or short of statutory right may be brought.
 15 U.S.C. Sec. 719h (1982).
 
 
 [3]
 Presidential reorganization plans submitted to Congress become effective unless disapproved. 5 U.S.C. Secs. 903, 906 (1982). After becoming effective, they are incorporated into the Statutes at Large and have the effect of law. Reorganization Plan No. 1 of 1979 was not disapproved by Congress, and thus has the force of statutory law
 
 
 [4]
 When ANGTA was passed, the Federal Power Commission (FPC) had jurisdiction, under the Natural Gas Act, to issue certificates of public convenience and necessity and approve filed rates for transportation of natural gas. This jurisdiction was transferred to the Federal Energy Regulatory Commission (FERC) by the Department of Energy Organization Act, 42 U.S.C. Sec. 7172(a)(1)(C) (Supp. V 1981), and Executive Order No. 12009, 42 Fed.Reg. 46,267 (1977). In this opinion all references to the FPC have been changed to FERC
 
 
 [5]
 Executive Office of the President, Energy Policy and Planning, Decision and Report to Congress on the Alaska Natural Gas Transportation System (1977) [hereinafter cited as Decision]
 
 
 [6]
 ANGTA required the President to issue a decision on the desirability of ANGTS and, if approval of ANGTS was recommended, to designate a transportation system for congressional approval. 15 U.S.C. Sec. 719e (1982). ANGTA provided for the President's decision to take effect upon enactment of a joint resolution of Congress. 15 U.S.C. Sec. 719f(a) (1982). President Carter's Decision was approved by joint resolution, and thereby became law, on November 8, 1977. Pub.L. No. 95-158, 91 Stat. 1268 (1977)
 
 
 [7]
 After the Federal Inspector approves a rate base for a segment of ANGTS, FERC reviews filed rates for that segment under the usual procedures provided by the Natural Gas Act, 15 U.S.C. Sec. 717c (1982). See, e.g., Northern Border Pipeline Co., Docket No. CP 78-124-008 (Dec. 30, 1983). It is not clear, however, if subsequent modifications of the rate base are covered by ANGTA or the Natural Gas Act. The OFI's position is that its responsibility under ANGTA ends when the whole pipeline is complete and gas is flowing from Alaska. We note that originally no tariff was to be charged until the whole pipeline was complete and commissioned and, at that time, OFI's responsibilities under ANGTA were to end. See Decision supra note 5, at 37-38. But pursuant to section 8(g)(1) of ANGTA, 15 U.S.C. Sec. 719f(g)(1), President Reagan allowed charges to be levied for transporting gas through completed segments of the pipeline even if Alaskan gas was not yet flowing. See Waiver of Law Pursuant to ANGTA, reprinted in, H.R.Rep. No. 350, 97th Cong., 1st Sess. (1981), approved by Congress, Pub.L. No. 97-93, 95 Stat. 1204. In light of this waiver, it is unclear if costs for a particular segment, incurred after the segment is already approved and operational, are related to initial operation and construction of that segment. We need not answer this question, since this case involves the construction costs of Northern Border that were incurred prior to the date its segment went into service. See Brief for Petitioner at 16 (noting that in-service date of Northern Border segment was September 20, 1982, while rate base determinations covered costs only through March 31, 1982)
 
 
 [8]
 In interpreting the Decision, we must give "deference to the interpretation given [a] statute by the officers or agency charged with its administration." Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). Both the OFI and FERC have consistently interpreted the Decision as we have--to mandate "timely" (i.e., ongoing and expedited) rate base approvals. See OFI Policy Statement, 46 Fed.Reg. 51726 (1981); FERC Delegation Order to the OFI, 45 Fed.Reg. 85511 (1980)
 The dissent places great weight on the fact that FERC delegated its authority to the OFI under the voluntary provision of the Reorganization Plan, section 202(b), rather than viewing the delegation as automatic under the mandatory "enforcement" provision of section 202(a). Diss.Op. at 1580. This does not mean, however, as the dissent implies, that FERC considered rate base approval as something other than enforcement, reviewable only under section 10 of ANGTA. In fact, FERC cites with approval the following OFI position:
 [Given] the ... Decision['s] ... mandate that the "applicant shall ... submit to [FERC] for approval on a timely basis all components of construction work in progress," [and] ... "[i]n light of the expansive scope of the Reorganization Plan--transferring to the OFI "exclusive responsibility for enforcement of all Federal statutes relevant to pre-construction, construction, and initial operation" of ANGTS--... such a transfer encompass[es] the rate base process.
 
 
 [45]
 Fed.Reg. 85511 (1980). FERC delegated responsibility for rate base determinations under Sec. 202(b), rather than viewing it as automatically delegated under Sec. 202(a), only because "all uncertainty as to responsibility for [their] performance should be eliminated." Id
 
 
 [9]
 The dissent rejects our position that the rate base approval is an authorization related to initial operation of ANGTS because "Northern Border had been operating the pipeline ... for several months prior to the issuance of the rate base determinations involved in this case." Diss.Op. at 1583. Even so, rate base determinations affect the ultimate just and reasonable price which Northern Border may obtain in gas transported prior to rate base approval. When Northern Border commenced operations, its tariff was based on unaudited costs of construction. See Order No. 31, 7 FERC (CCH) p 61,237 at 61,446. But to the extent particular amounts are excluded from the rate base by the OFI, Northern Border must refund any overcharges with interest. See id. at 61,470-71
 
 
 [10]
 As the dissent points out, the legislative history of the original ANGTA mentions ratemaking only once, stating that regulation of rates would be governed by the Natural Gas Act. Diss.Op. at 1582. That mention, however, is part of an explanation of a section of the Senate bill which Congress did not ultimately adopt, explicitly stating that the Natural Gas Act applies to the extent it is consistent with ANGTA. In addition, the statement may have meant only that the substantive provisions of the Natural Gas Act--e.g., that rates be just and reasonable--were to apply, but that its procedural protections would be superseded by the special procedures that the bill authorized FERC to promulgate for ANGTS. Other portions of the Senate debates that address the preemption of statutory law by ANGTA support this reading by focusing on the procedural nature of the Act's expedition and limited review provisions. See 122 Cong.Rec. 22,02 3 (1976) ("[t]his is a procedural bill which, unless otherwise explicitly stated therein, does not modify existing rights and obligations of affected persons") (statement of Senator Jackson); 122 Cong.Rec. 22021-22 (in issuing expedited permits, agency "is to comply with its own substantive law ... (except any strictly procedural requirements of law or regulations it becomes necessary to waive in order to accomplish the expedited construction of [ANGTS]")
 
 
 [11]
 Petitioner also contends that the OFI determination was unsupported by substantial evidence. Having determined that it falls within section 10 of ANGTA, we cannot consider this claim
 
 
 [12]
 The statute provides:
 Fixing rates and charges; determination of cost of production or transportation
 Whenever the Commission, after a hearing had upon its own motion or upon complaint of any State, municipality, State commission, or gas distributing company, shall find that any rate, charge, or classification demanded, observed, charged, or collected by any natural-gas company in connection with any transportation or sale of natural gas, subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory, or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force and shall fix the same by order.
 15 U.S.C. Sec. 717d(a) (1982).
 
 
 [13]
 Statutes are preempted only to the extent they are waived by the President pursuant to 15 U.S.C. Sec. 719f(g) (1982)
 
 
 [14]
 Northern Border responded to this factual contention in its brief on appeal, arguing that the Northern Plains contract was for services rendered before receipt of FERC's certificate of public convenience and necessity while the NEICO contract is for services after receipt of the certificate. Northern Border alleges that receipt of the certificate prompted significant increases in design and construction activity, which necessitated the new contract with NEICO. See Brief for Intervenor at 45
 
 
 [15]
 We reiterate that we are not deciding here whether the procedures used by the OFI would pass constitutional muster if ISCC challenged them on due process grounds, claiming that the rate base determination deprived them of a property interest. The issue of whether ISCC has such an interest has not yet been decided by the federal courts. See Metzenbaum v. FERC, 675 F.2d 1282, 1288 (D.C.Cir.1982) (not reaching complainant's claim that consumers have a constitutionally protected interest in the reasonableness of regulated rates)
 
 
 [16]
 See supra, text at 1574. The hearing requirement would be meaningless if the reviewing court had no way to satisfy itself that the agency did not ignore the comments submitted to it. See, e.g., General Motors v. FERC, 613 F.2d at 945 (agency decision, though committed to discretion, reviewed to ensure agency "confronted the salient features of the complaint")